Paul MITCHELL, Defendant–
Appellant,

v.

STATE of Indiana, Plaintiff–Appellee.

No. 49S00–9906–CR–343.

Supreme Court of Indiana.

April 16, 2001.

John Pinnow, Greenwood, IN, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Randi E. Froug, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

DICKSON, Justice

Paul Mitchell was convicted of dealing cocaine, a class A felony,[2] and carrying a handgun without a license, a class A misdemeanor,[3] and he was sentenced as a habitual offender.[4] In this direct appeal, he claims (1) violations of the state and federal constitutional provisions prohibiting unreasonable search and seizure and (2) insufficient evidence to support his conviction for possession of cocaine with intent to deliver.

### I. Search and Seizure

The defendant contends that the circumstances of his apprehension and arrest violated his rights to be secure from unreasonable search and seizure and that the resulting evidence should have been excluded. He filed a pretrial motion to suppress evidence and made timely trial objections. He argues that the trial court erred in admitting evidence obtained after a pretextual traffic stop and after a subsequent search pursuant to a warrant. He presents and argues separate claims under

---

**2.** Ind.Code § 35–48–4–1(b)(1).

**3.** Ind.Code § 35–47–2–23(c).

**4.** Ind.Code § 35–50–2–8.

the state and federal constitutions. His assertions arise from the following facts.

An Indianapolis hotel manager who suspected that a guest may be trafficking in drugs informed police that a guest, Paul Mitchell, paid cash for his room for over two weeks, gave a local address, asked to be registered as an anonymous person, and asked that the hotel not disclose his presence. Detective Chris Heffner, who had investigated Mitchell a few months earlier for allegedly dealing cocaine from a hotel room, established surveillance of Mitchell's room. During the surveillance, Heffner observed Mitchell arrive and join a female already in the room, and saw Mitchell and this female companion exit Mitchell's hotel room. As they left the hotel, Mitchell's companion was carrying a briefcase. Other police detectives, watching from an unmarked truck, observed Mitchell and his companion enter the hotel parking lot. They observed Mitchell carrying a briefcase. He and his companion got into a white Mercury Cougar automobile. Officer Chris Boomershine, in uniform and driving a marked squad car, was waiting nearby to follow them. He had participated in Heffner's prior narcotics investigation of Mitchell and an 18 year-old female companion, Deandra Miller, three months earlier and knew that a weapon had been recovered from Miller during this prior investigation.[5] As Mitchell's car drove away, both surveillance units followed. When Officer Boomershine observed Mitchell's vehicle fail to come to a complete stop, he notified Detective Heffner by radio, and Heffner instructed Boomershine to "go ahead and stop the vehicle and treat it as a regular traffic stop." Record at 302. Officer Boomershine activated his siren and lights, signaled

the driver to pull over, and he complied. Upon approaching the driver of the Cougar, Boomershine recognized him as Mitchell, the person he and Detective Heffner had previously investigated. Upon Boomershine's request, Mitchell provided his driver's license and a rental agreement for the automobile. Officer Boomershine observed that Mitchell appeared nervous and seemed "extremely concerned as to why I stopped him," and was "somewhat relieved" when told he had been stopped for a stop sign violation. Supp. Record at 126. Mitchell replied "Oh, I—I didn't see the stop sign." *Id.* Boomershine then asked Mitchell to step out of the car. Mitchell complied, and the officer then patted down Mitchell's exterior clothing and found no weapon but discerned by feel what he believed was ammunition in Mitchell's left front jacket pocket.

Officer Boomershine then approached Mitchell's passenger, Deandra Miller, who he recognized as Mitchell's companion in the prior investigation. Recalling that Miller had been carrying a weapon during the earlier investigation, the officer asked her if she had any firearms, and she responded "maybe." Supp. Record at 128. When Boomershine stated, "For my safety, I need the firearm," *id.*, Miller picked up her purse from the floor of the car and opened it to the officer, revealing a loaded .380 semiautomatic handgun and two bags of green plant material. When Miller advised Boomershine that she did not have a gun permit, he arrested her, handcuffing both Mitchell and Miller, and placed them in the back of his patrol car at approximately 2:50 p.m., about twenty minutes after the traffic stop commenced. The officer then issued Mitchell a traffic ticket

---

**5.** Officer Boomershine testified that no drugs were found in the earlier investigation and that no charges had been filed.

for the stop sign violation. Although the precise time or sequence is not clear from the record, Officer Boomershine radioed the results of his stop to Detective Heffner who instructed him to detain Mitchell and Miller, to transport them to the Marion County Sheriff's Department, and place them in an interview room while Heffner would seek a search warrant. Boomershine found seven rounds of .357 ammunition in Mitchell's coat. As one of the detectives from the unmarked truck got into and drove the Cougar back to the hotel parking lot, she noticed the butt of a gun protruding from underneath the driver's seat and the gun sliding around on the floor as she drove the car. With commendable caution and respect for the right of all people to be secure against unreasonable searches and seizures, the officers did not immediately seize the gun nor proceed to search the vehicle or the hotel room.

Instead, Detective Heffner prepared a probable cause affidavit to search the hotel room and the Cougar and obtained a search warrant. The search warrant was issued at 4:05 p.m. Heffner returned to the hotel and, executing the warrant beginning at approximately 4:30 p.m., he searched the car and found a loaded .357 revolver under the driver's seat, plastic bags containing 12.6270 grams of cocaine base (crack cocaine) and 26.8195 grams of powder cocaine, and $4,522 in cash in the briefcase in the trunk. Heffner arrested Mitchell after completing the searches of the automobile and hotel room. Before his formal arrest, Mitchell was detained for approximately 100 minutes after he was placed in handcuffs.

## A. Fourth Amendment

Challenging the validity of the traffic stop and weapons frisk, the length of detention, and the validity of the search warrant, the defendant contends that extensive evidence should have been excluded under the Fourth Amendment to the Constitution of the United States.

The defendant acknowledges that under the Fourth Amendment the traffic stop was valid regardless of whether it was a pretext for an investigation into drug activity and that police were authorized to order him to exit the vehicle. *See Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89, 98 (1996); *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). He argues, however, that the officer's attendant frisk and pat-down was not justified and that the officer's actions exceeded those permissible for a traffic stop.

 A routine traffic stop "is more analogous to a so-called *'Terry* stop' ... than to a formal arrest." *Knowles v. Iowa,* 525 U.S. 113, 117, 119 S.Ct. 484, 488, 142 L.Ed.2d 492, 498 (1998) (quoting *Berkemer v. McCarty,* 468 U.S. 420, 437, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317, 334 (1984)). The United States Supreme Court has recognized, however, that, due to the greater danger to an officer from a traffic stop when there are passengers present in addition to the driver of the stopped car, an officer making a traffic stop may order passengers to get out of the car pending completion of the stop. *Wilson,* 519 U.S. at 414–15, 117 S.Ct. at 886, 137 L.Ed.2d at 48. While the concern for officer safety may justify the additional intrusion of ordering a driver and passengers out of the car, a routine traffic stop "does not by itself justify the often considerably greater intrusion attending a full field-type search." *Knowles,* 525 U.S. at 117, 119 S.Ct. at 488, 142 L.Ed.2d at 498. An officer may perform a *Terry* "pat-down" of a driver or any passenger if he has reasonable suspicion that they may be armed and dangerous. *Id.* at 118, 119

S.Ct. at 488, 142 L.Ed.2d at 498. Balancing the "neutralization of danger to the policeman in the investigative circumstances and the sanctity of the individual," the *Terry* court concluded that there is a

> narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

*Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889, 909 (1968) (citations and footnote omitted). The search must be "strictly circumscribed by the exigencies which justify its initiation." *Id.* at 26, 88 S.Ct. at 1882, 20 L.Ed.2d at 908. "And in justifying the particular intrusion, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906.

▇ Under the Fourth Amendment, therefore, Officer Boomershine was entitled to make the traffic stop to issue a traffic citation, and to require Mitchell to exit the stopped car. The officer's authority to conduct a pat-down search, however, was dependent upon the nature and extent of his particularized concern for his safety and that of others.

The State argues that Officer Boomershine's pat down of Mitchell was justified because Boomershine knew that Mitchell was currently being investigated, that Boomershine had been required to provide mobile surveillance of him, that Mitchell had been the subject of a narcotics investigation in the past, that a weapon had been discovered on Mitchell's female companion on that occasion, and that Mitchell initially exhibited considerable nervousness and then relief when advised that he was only being stopped for a stop sign violation.

Officer Boomershine's instructions and intentions were to make a traffic stop for the stop sign violation. The State does not argue that, as of the time of the traffic stop, Officer Boomershine had any independent probable cause or sufficient reasonable suspicion to justify the stop, except for the traffic law violation. Officer Boomershine was thus initially justified only in making the stop and requiring Mitchell to exit the vehicle during the completion of the traffic citation. Mitchell's apparent nervousness and then relief does not give rise to a reasonable suspicion that he was armed and a danger to the officer's safety. From Officer Boomershine's testimony, it appears that Mitchell cooperated with the traffic stop. He handed over his license and the rental agreement and then exited the car when asked and stepped to the rear of the vehicle. Boomershine testified that "I then patted him down for my safety on his exterior clothing," but the officer's testimony did not express or explain any reasons for his safety concerns. Record at 396.

▇ We conclude that neither the officer's routine traffic stop of Mitchell for a stop sign violation, nor Mitchell's conduct after being stopped, provided any basis justifying the officer's pat down search of

Mitchell. This conclusion does not, however, reflect on the propriety of the subsequent police detention of Mitchell after finding an illegal weapon and probable drugs in the possession of Mitchell's companion.

Mitchell contends that his 100–minute detention was unreasonable and violated his rights under the Fourth Amendment because police failed to pursue their investigation with diligence. The defendant asserts that Detective Heffner's failure to employ a more rapid means of securing a warrant by using the telephonic warrant procedure set out in Indiana Code § 35–33–5–8,[6] unconstitutionally delayed his detention.

■ Although "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable

suspicion," *United States v. Place,* 462 U.S. 696, 709, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110, 122 (1983), there is no "bright line" for evaluating whether an investigative detention is unreasonable, and "common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605, 615 (1985). In *Sharpe,* the Court explained:

In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such

---

**6.** Ind.Code 35–33–5–8 provides:

(a) A judge may issue a search or arrest warrant without the affidavit required under section 2 of this chapter, if the judge receives sworn testimony of the same facts required for an affidavit:

(1) In a nonadversarial, recorded hearing before the judge;

(2) Orally by telephone or radio; or

(3) In writing by facsimile transmission (FAX).

(b) After reciting the facts required for an affidavit and verifying the facts recited under penalty of perjury, an applicant for a warrant under subsection (a)(2) shall read to the judge from a warrant form on which the applicant enters the information read by the applicant to the judge. The judge may direct the applicant to modify the warrant. If the judge agrees to issue the warrant, the judge shall direct the applicant to sign the judge's name to the warrant, adding the time of the issuance of the warrant.

(c) After transmitting an affidavit, an applicant for a warrant under subsection (a)(3) shall transmit to the judge a copy of a warrant form completed by the applicant. The judge may modify the transmitted war-

rant. If the judge agrees to issue the warrant, the judge shall transmit to the applicant a duplicate of the warrant. The judge shall then sign the warrant retained by the judge, adding the time of the issuance of the warrant.

(d) If a warrant is issued under subsection (a)(2), the judge shall record the conversation on audio tape and order the court reporter to type or transcribe the recording for entry in the record. The judge shall certify the audio tape, the transcription, and the warrant retained by the judge for entry in the record.

(e) If a warrant is issued under subsection (a)(3), the judge shall order the court reporter to retype or copy the facsimile transmission for entry in the record. The judge shall certify the transcription or copy and warrant retained by the judge for entry in the record.

(f) The court reporter shall notify the applicant who received a warrant under subsection (a)(2) or (a)(3) when the transcription or copy required under this section is entered in the record. The applicant shall sign the typed, transcribed, or copied entry upon receiving notice from the court reporter.

cases the court should not indulge in unrealistic second-guessing. A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But the fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable. The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

*Id.* at 686–87, 105 S.Ct. at 1575–76, 84 L.Ed.2d at 615–16 (citations and quotation marks omitted).

■ In this case, the decision to subject Mitchell to an investigative detention resulted after Miller, the 18 year-old passenger in his car, and who had been with him in a hotel room shortly before, was found to possess an unlicensed handgun and probable marijuana. Immediately before the stop, Mitchell and Miller were seen leaving the hotel with a briefcase. The purpose of the detention was to enable the police to obtain and execute a search warrant for the hotel room and vehicle that Mitchell and Miller had been occupying. Mitchell's detention began at 2:50 p.m. when he was placed in handcuffs and was no longer free to leave. Detective Heffner immediately prepared a probable cause affidavit, but instead of using the optional telephonic or fax method authorized by statute, he personally delivered it to a magistrate to seek a search warrant. The driving time to and from the magistrate was approximately one hour. The record does not reflect the time required to locate and present the request to the magistrate. The search warrant was issued at 4:05 p.m. and the search of the car began at approximately 4:30 p.m. Notwithstanding the availability of the fax and telephone methods for seeking a search warrant, we decline to find that Detective Heffner acted unreasonably by promptly and personally seeking the search warrant from the magistrate, rather than by attempting to obtain it remotely.

The defendant also argues that his motion to suppress should have been sustained and evidence excluded at trial because the magistrate who issued the search warrant did not have a substantial basis for concluding that probable cause existed. Mitchell urges that the probable cause affidavit did not allege facts that would establish a fair probability that evidence of dealing drugs would be found, that it was based on information from an unidentified individual whose credibility was not established, contrary to statute, and that it contained false statements knowingly included in the affidavit in reckless disregard for the truth.

■ A reviewing court is to focus on whether a "substantial basis" existed for a warrant authorizing the search or seizure, and doubtful cases are to be resolved in favor of upholding the warrant. *Illinois v. Gates,* 462 U.S. 213, 236–39 & n. 10, 103 S.Ct. 2317, 2331–32 & n. 10, 76 L.Ed.2d 527, 547–48 & n. 10 (1983). In determining whether a substantial basis exists, the reviewing court, with significant deference to the magistrate's determination must "focus on whether reasonable inferences drawn from the totality of the evidence support the determination." *Houser v. State,* 678 N.E.2d 95, 99 (Ind.1997).

Detective Heffner's probable cause affidavit, presented to support his request for a search warrant, reported that an Indianapolis hotel employee had advised Heffner that Mitchell was and had been a registered guest at the hotel for over two weeks, paying cash for his room, requesting that he be listed as anonymous, but

giving an Indianapolis address, and making several local calls. Heffner recognized Mitchell's name from a previous investigation three months earlier, at a different Indianapolis hotel, where a 9mm handgun was seized from the purse of Deandra Miller who was then occupying the room with Mitchell. Heffner's affidavit reported that Mitchell had previous convictions for robbery, battery, and possession of marijuana, and that Mitchell had also been arrested for dealing and possession of cocaine, the outcome of which was pending. The affidavit advised that Mitchell had just been stopped for a traffic violation and was accompanied by Miller, who was in possession of marijuana and a handgun. It reported that Officer Boomershine had also observed a handgun under Mitchell's seat. Detective Heffner stated his belief that Mitchell was using the hotel room "to facilitate illegal narcotics trafficking" and requested permission to search the hotel room and Miller's rental automobile "for illegal narcotics, weapons, monies, items assoc. w/illegal narcotics trafficking anyplace in the room or vehicle, these items may be kept, hidden, or stored." Supp. Record at 78.

■ The task of the issuing magistrate when receiving a request for a search warrant is to make a common sense determination, based on the totality of the circumstances, that there is a fair probability that a particular place contains evidence of a crime. *Gates,* 462 U.S. at 238, 103 S.Ct. at 2332, 76 L.Ed.2d at 548.

■ Mitchell urges that the probable cause affidavit was deficient because a portion of it was based on uncorroborated hearsay statements by the hotel employee, contrary to statute. Ind.Code § 35–33–5–2.[7] We find that the statute was not violated because the affidavit was not "based" on hearsay. The information provided by the hotel employee was only presented as a preliminary introductory matter to explain the investigation but did not provide information crucial to the probable cause determination.

Mitchell also contends that the warrant contained false statements. Specifically, he claims that the affidavit erroneously stated that Boomershine observed a handgun under the driver's seat and that Mitchell had previous felony convictions for robbery and battery. The handgun was not observed by Boomershine but by the detective who drove Mitchell's car back to the hotel, and although charged with felony robbery and battery, Mitchell ultimately pled guilty to misdemeanor battery and theft.

---

7. Ind.Code § 35–33–5–2 provides in pertinent part:

 (a) Except as provided in section 8 of this chapter, no warrant for search or arrest shall be issued until there is filed with the judge an affidavit:
 (1) Particularly describing:
 (A) The house or place to be searched and the things to be searched for; or
 (B) Particularly describing the person to be arrested;
 (2) Alleging substantially the offense in relation thereto and that the affiant believes and has good cause to believe that:
 (A) The things as are to be searched for are there concealed; or

 (B) The person to be arrested committed the offense; and
 (3) Setting forth the facts then in knowledge of the affiant or information based on hearsay, constituting the probable cause.
 (b) When based on hearsay, the affidavit must either:
 (1) Contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or
 (2) Contain information that establishes that the totality of the circumstances corroborates the hearsay.

■ Mistakes and inaccuracies in search warrant affidavits will not "vitiate the reliability of the affidavits so long as such mistakes were innocently made." *Utley v. State,* 589 N.E.2d 232, 236–37 (Ind. 1992). The party alleging that the mistakes were not innocent must make a substantial showing that the facts were included in reckless disregard for the truth. *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667, 672 (1978).

■ Mitchell urges that reckless disregard is shown because Detective Heffner obtained Mitchell's prior criminal history by telephone from police dispatch, which he acknowledged sometimes provides erroneous information, and because Heffner had personally investigated the defendant previously and therefore should have been familiar with the defendant's record. We disagree. It was not reckless disregard for Detective Heffner to not have Mitchell's criminal history memorized and to rely on police dispatch for this information under the circumstances. The alleged inaccuracies in Mitchell's criminal history are not significant to the determination of probable cause. Further, defendant does not contest the statements in the affidavit that refer to the convictions for robbery, battery, and possession of marijuana, nor to those alleging the arrest for dealing and possession of cocaine that were still pending. Similarly, it is not significant that the gun under Mitchell's car seat was observed by an officer different from the one reported on the affidavit. This erroneous attribution does not undermine the accuracy of the relevant fact of the gun's presence.

■ Looking at the totality of the evidence contained in the affidavit, primarily upon the gun and marijuana found on Mitchell's companion, Miller, the gun observed protruding from under the driver's seat of Mitchell's car, the general nature of Mitchell's criminal history, and with deference to the magistrate's determination, we find a substantial basis for finding probable cause to search the car and the hotel room.

We reject the defendant's claim that his convictions violate the Fourth Amendment.

## B. The Indiana Constitution

Separate from his federal Fourth Amendment claim, the defendant urges that the pretextual traffic stop and his subsequent lengthy detention before the automobile search were each unreasonable and thus violated Article 1, Section 11 of the Indiana Constitution. He argues that, because of these violations, the trial court should have suppressed the evidence of the ammunition found in the defendant's pocket, the weapon found under the driver's seat, the cocaine found in the car's console, and the $4,522 in cash found in the briefcase in the trunk.

The language of Article 1, Section 11, the search and seizure provision of the Bill of Rights of the Indiana Constitution, is virtually identical to its Fourth Amendment counterpart. Section 11 provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

When considered by the 1850–51 Constitutional Convention, Section 11 was adopted as recommended by the Committee on the Rights and Privileges of the Inhabitants of the State without any substantive debate.[8]

8. Report of the Debates and Proceedings of the Convention for the Revision of the Constitution

Its language is almost identical to the search and seizure provision in Indiana's original 1816 Constitution, article 1, section 8, which was likewise adopted without recorded discussion,[9] and which is virtually identical to the federal Fourth Amendment that had been ratified in 1791.

Despite the fact that Indiana's Section 11 appears to have derived from the federal Fourth Amendment and shares the same language, this Court has made an explicit point to interpret and apply Section 11 independently from federal Fourth Amendment jurisprudence. *Baldwin v. Reagan,* 715 N.E.2d 332, 337 (Ind.1999); *Moran v. State,* 644 N.E.2d 536, 540 (Ind. 1994). In *Moran,* we looked to the decisions of this court prior to 1961, when the Fourth Amendment became applicable to the states, and concluded that federal methodology for analyzing Fourth Amendment claims is not required "when applying the state reasonableness standard under Article 1, § 11." *Id.*

■ We have recognized that "the purpose of Article One, Section 11 is to protect from unreasonable police activity, those areas of life that Hoosiers regard as private." *Brown v. State,* 653 N.E.2d 77, 79 (Ind.1995); *Moran,* 644 N.E.2d at 540. Section 11 "must receive a liberal construction in its application to guarantee the people against unreasonable search and seizure." *Brown,* 653 N.E.2d at 79. In resolving challenges asserting this section, courts must consider the circumstances presented in each case to determine "whether the police behavior was reasonable." *Id.* We require the State to "bear the burden of showing that, in the totality of the circumstances, the intrusion was reasonable." *Baldwin,* 715 N.E.2d at 337.

"Admissibility is lawful if the court can declare the process reasonable." *Brown,* 653 N.E.2d at 79.

■ In construing and applying "unreasonable" under Section 11, we recognize that Indiana citizens have been concerned not only with personal privacy but also with safety, security, and protection from crime. Indeed, the Indiana Constitution was adopted to the end that "justice be established, public order maintained, and liberty perpetuated." IND. CONST. preamble. Its framers and ratifiers declared in Article 1 of its Bill of Rights that government is "instituted for [the people's] peace, safety, and well-being." IND. CONST. art. 1, § 1. When government intrusion is challenged under Section 11, therefore, reasonableness under the totality of circumstances may include consideration of police officer safety.

■ An automobile is an "effect" within the protection of Section 11. *Idol v. State,* 233 Ind. 307, 313, 119 N.E.2d 428, 431 (1954); *Robinson v. State,* 197 Ind. 144, 146–47, 149 N.E. 891, 892 (1925). We have recognized that "Hoosiers regard their automobiles as private and cannot easily abide their uninvited intrusion," *Brown,* 653 N.E.2d at 80, and that we "are extremely hesitant to countenance their casual violation, even by law enforcement officers who are attempting to solve serious crimes." *Id.* at 80 n. 3. A police stop and brief detention of a motorist is reasonable and permitted under Section 11 if the officer reasonably suspects that the motorist is engaged in, or about to engage in, illegal activity. *Baldwin,* 715 N.E.2d at 340. Reasonable suspicion exists if the facts known to the officer, together with the reasonable inferences arising there-

OF THE STATE OF INDIANA 989 (Reprint 1935) (1850).

9. JOURNAL OF THE CONVENTION OF THE INDIANA TERRITORY, 1816, at 63 (1816) *reprinted in* 61 IND.MAG.HIST 77 (1965).

from, would cause an ordinarily prudent person to believe that criminal activity has or is about to occur. *Id.*

The defendant contends that his convictions arose from a pretextual stop that constituted an unreasonable search and seizure under Section 11. He argues that he was stopped not for the purpose of enforcing traffic laws, but so that the state could further its criminal investigation. The defendant emphasizes that Office Boomershine was following the defendant only because he had been so ordered by Detective Heffner; that Boomershine did not stop the defendant immediately upon seeing the defendant run the stop sign; and he stopped the defendant after he had checked with Heffner for instructions on whether to make the traffic stop and was told to proceed. These facts are not disputed.

 Whether Article 1, Section 11, of the Indiana Constitution prohibits pretextual stops is an issue of first impression for this Court. As previously noted, Section 11, which protects citizens against unreasonable police conduct, permits police to stop and briefly detain a motorist if the officer reasonably suspects that the motorist is engaged in, or about to engage in, illegal activity. *Baldwin,* 715 N.E.2d at 340. We find nothing unreasonable in permitting an officer, who may have knowledge or suspicion of unrelated criminal activity by the motorist, to nevertheless respond to an observed traffic violation. It is likewise not unreasonable for a motorist who commits a traffic law violation to be subject to accountability for said violation even if the officer may have an ulte-

rior motive of furthering an unrelated criminal investigation. The potential for unreasonable search and seizure associated with such a traffic stop is most likely to arise not in the routine police handling of the observed traffic violation, but in the ensuing police investigatory conduct that may be excessive and unrelated to the traffic law violation. In this appeal, Mitchell argues that the stop itself was pretextual and thus violates Section 11, but he does not claim unreasonableness in Officer Boomershine's conduct in requesting Mitchell to exit the vehicle or in conducting a pat-down search. We find no error on his claim that he was subjected to a pretextual stop in violation of Article 1, Section 11, of the Indiana Constitution.

The defendant further contends in the alternative that, even if the pretextual stop is found reasonable, the length of time he was detained prior to the automobile search was unreasonable under Section 11.[10] Asserting a detention of 100 minutes, Mitchell argues that Officer Boomershine stopped him at approximately 2:30 p.m., handcuffed him at 2:50 p.m., transported him to police headquarters, and then held him there while Detective Heffner prepared the probable cause affidavit, obtained the search warrant, and returned to begin searching the Mitchell vehicle at 4:30 p.m. The parties agree that much of the delay resulted from Heffner's travel time from the hotel to the magistrate and back. The defendant argues that the State should have used a telephone warrant procedure[11] instead of physically de-

---

**10.** Mitchell's claim of unreasonable search and seizure under Section 11 is directed only against the pretextual stop and the subsequent lengthy detention. He does not challenge the officer's actions in requiring Mitchell to exit his vehicle or in conducting the pat-down search. We therefore do not address

whether the totality of circumstances supports a reasonable suspicion justifying the requirement that Mitchell exit the car and submit to a pat-down search.

**11.** Ind.Code § 35–33–5–8.

livering the probable cause affidavit and obtaining the search warrant.

The State argues that Mitchell's detention was based on probable cause and is justified by Officer Boomershine's discovery of seven .357 caliber bullets in Mitchell's pocket and the .380 caliber weapon and probable marijuana in his companion's purse. Since Mitchell's bullets did not match his companion's handgun, the State urges that Officer Boomershine had reason "to believe that Defendant may have had another handgun in the car" and "to infer that Defendant at least committed the misdemeanor of carrying a handgun without a license, if not the class C felony." Br. of Appellee at 15.

Were it not for the unusual circumstances of this case, particularly the weapon and probable marijuana that police observed in the purse of Mitchell's companion and Boomershine's knowledge of the current and a recent prior police narcotics investigation of Mitchell and Miller, it is possible that the reasonableness of Mitchell's detention would have been a close issue. A reasonable search under Section 11 would permit an officer to briefly detain a motorist only as necessary to complete the officer's work related to the illegality for which the motorist was stopped. The protracted detention at issue here, however, was not related to Mitchell's stop sign violation but to the ensuing discovery of the weapon and probable drugs in the possession of Mitchell's passenger, combined with Boomershine's knowledge regarding the current and past narcotics investigations involving Mitchell and Miller. We find that the length of Mitchell's detention was not unreasonable in light of the totality of the circumstances, notwithstanding the failure of Det. Heffner to utilize the telephone warrant procedure.

We conclude neither the stop of the defendant nor his lengthy detention under the totality of the circumstances constituted an unreasonable search or seizure in violation of Art. 1, Sec. 11 of the Indiana Constitution.

## II. Sufficiency of the Evidence

Mitchell contends that there is insufficient evidence that he knowingly possessed the cocaine found in the console of the rental car and that, without knowing possession of cocaine, there is insufficient evidence of possession of cocaine with intent to deliver.

Acknowledging that possession of narcotics found in a vehicle may be imputed to the driver under the theory of constructive possession, Mitchell argues that where the driver's possession is not exclusive, there must be proof of additional circumstances pointing to his knowledge of the drugs and their presence in the vehicle.

In reviewing a claim of insufficient evidence, we will affirm the conviction unless, considering only the evidence and reasonable inferences favorable to the judgment, and neither reweighing the evidence nor judging the credibility of the witnesses, we conclude that no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Jenkins v. State*, 726 N.E.2d 268, 270 (Ind. 2000); *Webster v. State*, 699 N.E.2d 266, 268 (Ind.1998); *Hodge v. State*, 688 N.E.2d 1246, 1247–48 (Ind.1997).

Mitchell asserts that being the driver of the car where the cocaine was found is not enough to support the inference that he maintained dominion and control over the cocaine. He argues that the rental car contract was not in his name, that he was not observed arriving at the hotel in the car; and that there was no evidence that either he or Miller placed anything in the console when they got into the car.

Constructive possession will support a possession conviction if the state shows that the defendant had both the capability and the intent to maintain dominion and control over the contraband. *Goliday v. State*, 708 N.E.2d 4, 6 (Ind. 1999); *Lampkins v. State*, 685 N.E.2d 698, 699 (Ind.1997). Proof of a possessory interest in the premises where the contraband was found will suffice to prove capability. Mitchell was listed as an additional driver on the rental contract and was the actual driver of the car. Clearly, he had the capability to maintain dominion and control.

Where a person's control is non-exclusive, intent to maintain dominion and control may be inferred from additional circumstances that indicate that the person knew of the presence of the contraband. *Goliday*, 708 N.E.2d at 6. In addition to Mitchell's proximity to the cocaine in the car console between the 34 year-old Mitchell and his 18 year-old female passenger, the evidence included the 12.627 grams of crack cocaine and 26.819 grams of powder cocaine in the car console, the large amount of cash in the briefcase in the trunk of the car, a half a dozen boxes of plastic baggies commonly used by narcotics dealers for cocaine in a storage locker the receipt for which was found in Mitchell's hotel room. The ammunition found in Mitchell's coat pocket was of the same caliber as the weapon found under Mitchell's car seat. From this evidence and its reasonable inferences, we find that the jury could have found the crime of possession of cocaine with intent to deliver proven beyond a reasonable doubt.

### III. Conclusion

The judgment of the trial court is affirmed.

SHEPARD, C.J., and SULLIVAN and BOEHM, JJ., concur.

RUCKER, J., concurs in Parts IA, II, and III, and concurs in result in Part IB.