## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 29 2019, 5:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Bryan L. Cook
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Edwin David Calligan, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | March 29, 2019 <br><br> Court of Appeals Case No. <br> 18A-CR-199 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable John F. Surbeck, Jr., Judge <br><br> Trial Court Cause No. <br> 02D04-1603-F4-28 |

**Pyle, Judge.**

# Statement of the Case

Edwin David Calligan ("Calligan") appeals his conviction by jury of Level 4 felony unlawful possession of a firearm by a serious violent felon.[1] He argues that the trial court abused its discretion in admitting evidence of a handgun that was found during a search of the vehicle that Calligan was driving. Calligan specifically contends that the initial stop and the subsequent search of the car violated both the federal and state constitutions. Finding no abuse of the trial court's discretion, we affirm the trial court's judgment.

We affirm.

# Issue

> Whether the trial court abused its discretion in admitting evidence of the handgun that was found during a search of the vehicle that Calligan was driving.

# Facts

In the early morning hours of March 25, 2016, Fort Wayne Police Department Detectives Marc Deshaies ("Detective Deshaies") and Tim Hughes ("Detective Hughes"), who were affiliated with the Gang and Violent Crime Unit, were working in a high-crime area near Foster's Bar and Grill ("Foster's"). Specifically, the area is known for problems with drug trafficking, violence and

---

[1] IND. CODE § 35-47-4-5.

fights, and shots-fired incidents. At approximately 2:30 a.m., the detectives observed a group of people in a nearby parking lot that were involved in a loud, heated argument, which appeared to be on the verge of turning into a physical altercation. The individuals involved in the argument got into three different vehicles and drove off together in a processional line. The lead vehicle was a Dodge Charger ("the Charger"), which was followed by a Chevrolet Impala ("the Impala") and an Infinity ("the Infinity").

[4] Detectives Deshaies and Hughes followed the vehicles, which accelerated quickly. The detectives noticed that the Charger was repeatedly swerving within its lane, and, at one point, almost struck the curb. The Charger subsequently came to a complete and sudden stop in the middle of an intersection before continuing through the intersection. Detective Deshaies, who had been trained to "pace" a vehicle to determine its speed, "paced" the cars, all of which frequently exceeded the thirty-five-mile-per-hour speed limit. (Motion to Suppress Tr. at 13). After the Infinity turned off onto a side street, the driver of the Impala appeared to be trying to prevent the officers from moving between it and the Charger.

[5] Concerned that the driver of the Charger was impaired, the detectives initiated a traffic stop in a residential area after managing to maneuver behind the Charger. The driver of the Charger slowed down but continued to move forward for thirty to forty feet. As the detectives walked toward the stopped Charger, it began to roll forward again. As the detectives were yelling for the car to be put in park, Calligan, the driver, leaned out the window and

responded that the Charger had stopped even though the car was continuing to roll forward. When the Charger came to a complete stop, the detectives noticed two passengers and movement in the vehicle. Other officers who had heard radio communications about the Charger's initial failure to stop immediately began arriving on the scene.

[6] As Detective Deshaies approached the Charger and began to speak with Calligan, the detective immediately smelled the odor of alcohol emanating from Calligan. Further, Calligan's speech was slurred, his eyes were bloodshot, and he fumbled through his wallet attempting to find his insurance card. Concerned that Calligan might attempt to drive off again, Detective Deshaies asked Calligan for the keys to the car several times. Calligan refused to comply with the detective's request and was "incredibly argumentative." (Motion to Suppress Tr. at 32). He subsequently removed the keys from the ignition, refused to hand them to Detective Deshaies, and dropped them in the center console.

[7] While Detective Deshaies was speaking with Calligan, other officers approached the front-seat passenger, who identified himself by a name that the officers immediately knew to be false. This passenger eventually had to be forcibly removed from the car after he refused to get out of the vehicle when the officers asked him to do so. An on-scene fingerprint identification revealed that the passenger had an active warrant for failing to appear in a gun case. At the same time, several females who had been in the Impala returned to the scene on

foot and were loudly challenging the officers' actions and had to be physically restrained from interfering with the ongoing traffic stop.

[8] As Detective Deshaies was checking Calligan's information, other officers asked Calligan and the rear-seat passenger to exit the car and sit on the curb a few feet behind the Charger. The men were not handcuffed. Fort Wayne Police Department Sergeant Gary Hensler ("Sergeant Hensler") searched the interior of the Charger for the purpose of officer safety and found a loaded handgun between the driver's seat and the center console. Detective Hensler then handcuffed Calligan and the rear-seat passenger.

[9] The State charged Calligan with Level 4 felony unlawful possession of a firearm by a serious violent felon; Class A misdemeanor unlawful possession of a firearm by a domestic batterer, and Class A misdemeanor operating while intoxicated. Calligan filed a motion to suppress. At the suppression hearing, Sergeant Hensler responded as follows when asked why he had searched the car: "Well for all the reasons we already had, um, extended period of time to pull over, starting and stopping, fear of them retrieving a weapon, hiding contraband, formulating a plan, uh, the front seat passenger showing deception." (Motion to Suppress Tr. at 99). Following the hearing, the trial court denied Calligan's motion to suppress. Before trial, the State dismissed the misdemeanor counts.

[10] Calligan objected to the admission of the gun at trial. Also at trial, Detective Deshaies testified that he and Detective Hughes were concerned when

Calligan's car kept rolling at the time of the stop. According to Detective Deshaies, "[t]ypically when we see these . . . stops that take a very long time to stop in my experience and training[,] it's because people are either trying to secret or access contraband or weapons in the car prior to being stopped." (Tr. Vol. 1 at 41-42). Sergeant Hensler testified that he had searched the vehicle for officer safety because: (1) the Charger did not stop immediately, which suggested that the vehicle's occupants might have been attempting to hide weapons or drugs; (2) the traffic stop occurred in a high crime area where there were many drug transactions and shootings; and (3) the women from the Impala were very upset over the traffic stop and could have distracted the officers or assisted the men in the Charger with committing a crime, including assaulting the officers.

[11] Fort Wayne Police Department Detective Matthew Foote ("Detective Foote") had also been conducting surveillance in the area of Foster's. According to Detective Foote, police officers had been called to Foster's for shootings, stabbings, and fights, and there had been a killing there the previous month. When he arrived at the scene of the traffic stop, Detective Foote was concerned when the front-seat passenger gave a name that the officers knew was not his. Detective Foote further explained that "often times when somebody supplies us with a false name[,] it's to cover up criminal activity. Often times they are fugitives from justice, and that's what it ended up being in this case." (Tr. Vol. 1 at 110).

[12] During Calligan's presentation of evidence, Tiffany Simpson ("Simpson") testified that she had been dating Calligan in March 2016. Simpson further testified that the gun in the Charger belonged to her and that the Charger belonged to her mother, who allowed Simpson, Calligan, and other family members to drive it. Calligan was unable to drive his car at the time because "there was something major wrong with it." (Tr. Vol. 1 at 161).

[13] The jury convicted Calligan of Level 4 felony unlawful possession of a firearm, and he now appeals.

# Decision

[14] Calligan contends that the trial court erred in denying his motion to suppress the gun that was found in the car that he was driving. Because Calligan appeals following his conviction and is not appealing the trial court's interlocutory order denying his motion to suppress, the question is properly framed as whether the trial court abused its discretion in admitting the gun into evidence. *See Parish v. State*, 936 N.E.2d 346, 349 (Ind. Ct. App. 2010), *trans. denied*. The admission of evidence is within the sound discretion of the trial court, and we will reverse only for an abuse of that discretion. *Rogers v. State*, 897 N.E.2d 955, 959 (Ind. Ct. App. 2008), *trans. denied*. A trial court abuses its discretion if its decision is clearly against the logic and the effect of the facts and circumstances before the court or if the court has misinterpreted the law. *Id.* We do not reweigh the evidence, and we consider conflicting evidence most favorable to

the trial court's ruling. *Collins v. State*, 822 N.E.2d 214, 218 (Ind. Ct. App. 2005), *trans. denied*.

## 1. Initial Stop

Calligan first argues that the initial stop of the car that he was driving violated both the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution. We address each of his contentions in turn.

### A. Fourth Amendment

The Fourth Amendment provides protection against unreasonable searches and seizures of a person. *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013). A traffic stop of a vehicle is a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809 (1996). For a search or seizure to be reasonable under the Fourth Amendment, a warrant is required unless an exception to the warrant requirement applies. *Taylor v. State*, 842 N.E.2d 327, 330 (Ind. 2006). The State bears the burden of showing that a warrantless search or seizure is within an exception to the warrant requirement. *Id.*

One such exception is set forth in *Terry v. Ohio*, 392 U.S. 1, 30 (1968), wherein the United States Supreme Court held that a police officer may briefly detain a person for investigatory purposes if, based on specific articulable facts together with reasonable inferences drawn therefrom, an ordinarily prudent person would reasonably suspect that criminal activity was afoot. Reasonable

suspicion is determined on a case-by-case basis by examining the totality of the circumstances. *Terry*, 392 U.S.at 30. Further, the law is well-settled that a police officer is constitutionally permitted to stop and briefly detain a person who has committed a traffic infraction. *See* IND. CODE § 34-28-5-3; *State v. Quirk*, 842 N.E.2d 334, 340 (Ind. 2006).

[17] Here, our review of the evidence reveals that the detectives had reasonable suspicion to stop Calligan for two reasons. First, Detective Deshaies, who had been trained to "pace" a vehicle, "paced" the car that Calligan was driving and determined that Calligan was exceeding the thirty-five-mile-per-hour speed limit.[2] Driving in excess of the speed limit is an infraction. *See* IND. CODE § 9-21-5-2. Second, Detective Deshaies had reasonable suspicion that Calligan was operating the Charger while intoxicated. Specifically, the detective observed the Charger repeatedly swerving within its lane and almost hitting a curb. Calligan also stopped the Charged in the middle of an intersection before continuing through the intersection. *See Potter v. State*, 912 N.E.2d 905, 906-08 (Ind. Ct. App. 2009) (finding reasonable suspicion for a stop where Potter was weaving within his lane of travel and almost struck a median). The initial stop of the Charger did not violate the Fourth Amendment of the United States Constitution

---

[2] Regarding Calligan's challenge to Detective Deshaies' "pacing" of the Charger to determine its speed, we agree with the State that Calligan's challenge is "simply a request to reweigh the [detective's] credibility and refuse to credit his testimony that he paced [Calligan's] vehicle and determined that it was exceeding the speed limit." (State's Br. at 13). This we cannot do. *See Collins*, 822 N.E.2d at 218.

## B.    Article 1, Section 11 of the Indiana Constitution

[18]    We now analyze the stop under the Indiana Constitution. Although Article 1, Section 11 of the Indiana Constitution is identical to the Fourth Amendment, it is analyzed differently. *Croom v. State*, 996 N.E.2d 436, 442 (Ind. Ct. App. 2013), *trans. denied*. Indiana Constitutional analysis focuses on the reasonableness of police conduct under the totality of the circumstances. *Id.* (citing *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005)). We determine the reasonableness under the Indiana Constitution by balancing "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Litchfield*, 824 N.E.2d at 361. The State has the burden of proving that police intrusion into privacy was reasonable under the totality of the circumstances. *Id.* "It is unequivocal under our jurisprudence that even a minor traffic violation is sufficient to give an officer probable cause to stop the driver of a vehicle." *Austin v. State*, 997 N.E.2d 1027, 1034 (Ind. 2013).

Here, our review of the evidence reveals that the degree of concern, suspicion, or knowledge that a violation had occurred was high. The Charger was speeding, swerving in its lane and almost hit a curb. It also stopped in the middle of an intersection. Second, the degree of intrusion was slight. Detective Deshaies stopped the vehicle to determine whether Calligan was impaired. *See e.g.*, *Mitchell v. State*, 745 N.E.2d 775, 787 (Ind. 2001) (explaining that Article 1, Section 11 does not prohibit police from conducting a justified traffic stop).

Lastly, the needs of law enforcement were reasonable. The only way to determine whether Calligan was impaired was to stop the Charger. The stop was an appropriate manner of enforcing traffic laws. Balancing the high degree of concern, suspicion, or knowledge that a violation had occurred and the needs of law enforcement against the low degree of intrusion, we conclude that Detective Deshaies' initial stop of the Charger was reasonable under the Indiana Constitution.

## 2. Search of the Vehicle

[19] Calligan further argues that even if the initial stop was valid, the search of the car that he was driving violated both the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution. We again address each of his contentions in turn.

### A. Fourth Amendment

[20] The Fourth Amendment allows privacy interests protected by the Fourth Amendment to be balanced against the interests of officer safety. *Wilson v. State,* 745 N.E.2d 789, 792 (Ind. 2001). In *Michigan v. Long*, the United States Supreme Court explained as follows:

> Our past cases indicate then that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect. These principles compel our conclusion that the search of the passenger compartment of an

automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" [1] the officers in believing that the suspect is dangerous *and* [2] the suspect may gain immediate control of weapons. "[T]he issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."

463 U.S. 1032, 1049-50 (1983) (quoting *Terry*, 392 U.S. 1 at 21 and at 27) (emphasis added). The Supreme Court stressed that police officers are not required to adopt alternative means to ensure their safety in order to avoid privacy intrusions in this type of *Terry* investigation because it involves "a police investigation 'at close range' when the officer remains particularly vulnerable in part because a full custodial arrest has not been effected, and the officer must make a "quick decision as to how to protect himself and others from possible danger[.]'" *Long*, 463 U.S. at 1052 (quoting *Terry*, 392 U.S. at 24).

[21] This Court has previously explained that "[t]he purpose of a limited search for weapons after an investigative stop is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear for his safety or the safety of others." *State v. Joe*, 693 N.E.2d 573, 575 (Ind. Ct. App. 1998), *trans. denied*. Therefore, when a vehicle has been properly stopped for investigative purposes, if the officer reasonably believes that he or others may be in danger and the suspect may gain immediate access to a weapon, he may conduct a limited search of the automobile's interior for weapons without first obtaining a

search warrant. *State v. Dodson*, 733 N.E.2d 968, 971 (Ind. Ct. App. 2000); *Long*, 463 U.S. at 1052.

[22] Here, our review of the evidence reveals that *Long's* first prong is satisfied because the officers had reasonable suspicion to believe that Calligan was dangerous at the time they searched the car. *See Long*, 463 U.S. at 1050. Specifically, Calligan had initially failed to stop the Charger and had begun moving forward again when the detectives walked towards the vehicle. This action created a reasonable fear on the part of the detectives that Calligan was contemplating fleeing or that he was trying to hide or access a weapon. The detectives had also noticed movement in the Charger before it had come to a complete stop. Further, Calligan was highly argumentative and refused to hand his keys to the detective. Calligan also appeared to be intoxicated. In addition, the front seat passenger, who had given the detectives a false name and who was wanted on an active warrant for failing to appear in a gun case, refused to exit the Charger and had to be forcibly removed from the vehicle.

[23] In addition, *Long's* second prong is satisfied because the officers had reasonable suspicion to believe that Calligan or his rear-seat passenger could have regained immediate control of the weapon in the vehicle. Neither man was handcuffed and both men were sitting on a curb a few feet behind the vehicle. *See id. See also United States v. Arnold*, 388 F.3d 237, 240 (7th Cir. 2004) (concluding that it was reasonable to believe that Arnold, who was not arrested, could have regained access to his vehicle). In addition, the officers knew that the Charger's front-seat passenger was wanted on a warrant in a gun case. The search of the

Charger did not violate the Fourth Amendment of the United States Constitution.

## B. Article 1, Section 11 of the Indiana Constitution

[24] We now return to the *Litchfield* factors to determine whether the search of the Charger was reasonable under the Indiana Constitution. *See Litchfield*, 824 N.E.2d at 36. Our review of the evidence reveals that the degree of concern, suspicion, or knowledge that a violation had occurred was high. In the early morning hours in a high-crime neighborhood, detectives saw Calligan involved in a loud heated argument before he got into the Charger. The detectives then saw Calligan commit the infraction of speeding. Calligan was also swerving in his lane, almost hit the curb, and came to a stop in the middle of an intersection, giving the detectives reasonable suspicion to believe that he was operating the vehicle while intoxicated. Calligan initially failed to comply with the officers' order to stop, and the vehicle's occupants were making movements consistent with an attempt to hide a weapon. In addition, the front seat passenger was wanted on an active warrant.

[25] Turning to the degree of intrusion, in *Masterson v. State*, 843 N.E.2d 1001, 1007 (Ind. Ct. App. 2006), *trans. denied*, we explained that although "the search of Masterson's vehicle was likely to impose an intrusion 'on the citizen's ordinary activities,' *Litchfield v. State*, 824 N.E.2d at 361, 'we recognize[d] that, to a limited extent, the intrusion, at least as to public notice and embarrassment, was somewhat lessened because of the hour and place of the search.' *Myers v.*

*State*, 839 N.E.2d at 1154 (search occurred after midnight and in driveway of defendant's mobile home)." We further noted that, at the time, it was not even clear to police that Masterson owned the vehicle subject to the search as it was registered to another individual. *Id.* Here, as in *Masterson,* the intrusiveness of the search was lessened where it occurred at 2:30 a.m. in a residential neighborhood, and the Charger did not belong to Calligan.

[26] In addition, the needs of law enforcement were reasonable. The stop occurred in a high-crime neighborhood, and the Charger's occupants did not initially comply with the detective's directives. When the Charger stopped, the detectives noticed movement in the vehicle, which suggested that the occupants might have been attempting to hide weapons. One of the vehicle's occupants gave the detectives a false name and had an active warrant. Further, several females who had been in the Impala walked to the scene and were challenging the officers' actions, and officers did not know whether the Infinity and its occupants would arrive at the scene. In addition, Calligan and the rear-seat passenger were sitting on a curb a few feet behind the vehicle, and neither man was handcuffed. Again, balancing the high degree of concern, suspicion, or knowledge that a violation had occurred and the needs of law enforcement against the lessened degree of intrusion, we conclude that the search of the Charger was reasonable under the Indiana Constitution.

[27] Finding no federal or state constitutional violation, we conclude that the trial court did not abuse its discretion in admitting the gun into evidence.

[28] Affirmed.

Vaidik, C.J., and Barnes, Sr. J., concur.