ATTORNEYS FOR APPELLANT
Ann M. Sutton
Indianapolis, Indiana

Timothy J. Burns
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana



# In the
# Indiana Supreme Court

No. 49S02-0811-CR-591

DAMEN HOLLY,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Marion Superior Court, Criminal Division, Room 10
No. 49F10-0703-CM-026737
The Honorable Linda E. Brown, Judge

On Petition To Transfer from the Indiana Court of Appeals, No. 49A02-0711-CR-930

**December 18, 2009**

**Rucker, Justice.**

Damen Holly was stopped by police after a license plate check showed he was driving a vehicle owned by a driver whose license was suspended. Even though Holly himself was not the owner, the stop was permissible under our decision today in Armfield v. State, No. 29S02-0811-CR-590, ___ N.E.2d ___ (Ind. Dec. 18, 2009). However, the subsequent search of the vehicle was conducted absent reasonable suspicion and thus violated Holly's Fourth Amendment rights.

**Facts and Procedural History**

At approximately 11:30 p.m. on January 19, 2007, Officer Jason Ross of the Indianapolis Metropolitan Police Department was conducting a routine patrol in his police car. While traveling southbound on a street in Indianapolis, he ran a license plate check of the vehicle traveling in front of him. The check indicated that the vehicle was registered to an African-American female named Terry Sumler, provided her date of birth, and showed that Sumler's driver's license was suspended. Based upon this information, Officer Ross initiated a traffic stop of the vehicle to identify the driver. He approached the vehicle and observed that the driver (later identified as Damen Holly) was male and that there were two passengers, Sumler and Holly's brother. He asked Holly for a driver's license, which Holly admitted that he did not have. Holly and the other passengers then provided other identifying information. Officer Ross ran additional computer checks and discovered that Holly's license, as well as those of the other passengers, was suspended. He ordered them to exit the vehicle, and directed back-up Officer Hannaford to conduct a search of the vehicle. The search produced a small bag containing what was later confirmed to be marijuana. When questioned at the scene, Holly admitted the marijuana belonged to him.

The State charged Holly with possession of marijuana as a Class A misdemeanor. During his bench trial, Holly moved to suppress the introduction of the marijuana as well as his admission, arguing that the officers lacked reasonable suspicion to search the vehicle after discovering that the driver was not the registered owner. The trial court denied the motion and found Holly guilty as charged.

Holly appealed, and the Court of Appeals reversed. In doing so the court found that Officer Ross lacked reasonable suspicion to initiate the traffic stop because "[a] police officer's knowledge that an owner of a vehicle may not lawfully drive creates reasonable suspicion of criminal activity *only where the officer has reason to believe that the owner is actually driving the vehicle.*" Holly v. State, 888 N.E.2d 338, 343 (Ind. Ct. App. 2008) (emphasis in original). Although we also reverse the judgment of the trial court, we do so on grounds slightly different from those of our colleagues. Thus, the State's petition to transfer having been previously granted, the opinion of the Court of Appeals is thereby vacated. Ind. Appellate Rule 58(A).

**Discussion**

The State contends that a "police officer has reasonable suspicion to stop a vehicle upon learning that the driver's license of the registered owner of the vehicle is suspended." Appellee's Pet. for Trans. at 6. Holly counters by arguing that "the traffic stop of the car he was driving was in violation of law," Br. of Appellant at 4, specifically both the Fourth Amendment to the United States Constitution[1] and its state counterpart, Article I, Section 11 of the Indiana Constitution.[2] See id. at 5-7.

Our companion case, Armfield, which we also decide today, provides the analytical framework to resolve this issue. We held in Armfield that "an officer has reasonable suspicion

---

[1] The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." This provision applies to the states through the Fourteenth Amendment. Krise v. State, 746 N.E.2d 957, 961 (Ind. 2001).

[2] Article I, Section 11 of the Indiana Constitution is nearly identical to the Fourth Amendment and provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized." It is established that "[n]otwithstanding the textual similarity of Article 1, § 11 of the Indiana Constitution to that of the federal Fourth Amendment, Section 11 is interpreted separately and independently from Fourth Amendment jurisprudence." State v. Washington, 898 N.E.2d 1200, 1205-06 (Ind. 2008) (citing Mitchell v. State, 745 N.E.2d 775, 786 (Ind. 2001)). However, because the search here violated Holly's Fourth Amendment rights, we find it unnecessary to resolve his Article I, Section 11 claim.

to initiate a <u>Terry</u>[3] stop when (1) the officer knows that the registered owner of a vehicle has a suspended license and (2) the officer is unaware of any evidence or circumstances which indicate that the owner is not the driver of the vehicle." <u>Armfield</u>, slip op. at 8.

Here, Officer Ross's license plate check indicated that the vehicle traveling in front of him was registered to an African-American female named Terry Sumler and that Sumler's driver's license was suspended. He testified at trial that the information about the license suspension "led me to stop the vehicle." Tr. at 10. Because it was close to midnight and the vehicle was traveling in front of him for the entire time before the stop, Officer Ross did not have a chance to observe the driver before initiating the stop. Under these circumstances, we hold that Officer Ross had reasonable suspicion to initiate an investigatory <u>Terry</u> stop of Sumler's vehicle. However this does not end our inquiry.

The fundamental principle upon which a <u>Terry</u> stop is based is that the officer has reasonable suspicion to believe that criminal activity has occurred or is about to occur. Or in the words of <u>Terry</u>, that "criminal activity may be afoot." <u>Terry</u>, 392 U.S. at 30. To be sure, if a license plate check reveals that the driver's license of the vehicle's registered owner has been suspended, then there is reason to believe (a) the registered owner is driving the vehicle, and thus (b) is doing so illegally. Under those circumstances, in <u>Terry</u> terms, an officer has reasonable suspicion to believe that criminal activity is afoot. But once it becomes apparent that the driver of the vehicle is not the owner then an officer simply has no reason to conduct additional inquiry. An officer has reasonable suspicion to conduct a <u>Terry</u> stop when among other things, "the officer is unaware of any evidence or circumstances which indicate that the owner is not the driver of the vehicle." <u>Armfield</u>, slip op. at 8.

Evidence and circumstances, like facts, are "stubborn things."[4] And the evidence in this case is stubbornly clear that before Officer Ross told Holly to produce his driver's license,

---

[3] <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).

[4] "Facts are stubborn things, and whatever may be our wishes, our inclinations, or the dictums of our passions, they cannot alter the state of facts and evidence." David McCullough, <u>John Adams</u> 68 (2001) (quoting John Adams).

4

Officer Ross knew that Holly was not the owner of the vehicle. In Officer Ross's own words, his license plate check revealed that "the registered owner [of the vehicle] was a black female," Tr. at 20; and Officer Ross acknowledged that when he approached the car Holly (a black male) was in the driver's seat and "was not the same person that was registered to the car." Tr. at 11. It is of no import that Officer Ross had already initiated a lawful stop before he first observed the driver. Reasonable suspicion to pull a car over does not confer unconditional authority to request the driver's license and registration. See 4 Wayne R. LaFave, Search and Seizure § 9.3(c) n.95 (4th ed. 2004) ("The importance of the violation of law to the authority to run a check on a license and registration is illustrated by those cases holding that if there is a stopping on either reasonable suspicion or probable cause of a traffic violation which is determined immediately after the stop not to have been a violation at all, the officer may not continue the detention for a license/registration check.").

In sum there is simply nothing in this record justifying any further inquiry subsequent to the valid Terry stop. Indeed as we noted in Armfield there are "helpful examples" from other jurisdictions of "evidence or circumstances which indicate that the owner is not the driver of the vehicle." Armfield, slip op. at 8 n.8. See, e.g., State v. Tozier, 905 A.2d 836, 839 n.1 (Me. 2006) ("[I]f the driver were of a different gender than the owner, the officer would lack reasonable grounds to assume the owner was driving."); People v. Jones, 678 N.W.2d 627, 631 n.4 (Mich. Ct. App. 2004) ("[I]f the registered owner was a male and the driver was a female, the officer would not have reasonable grounds to assume that the driver was the owner."). And at least two federal jurisdictions that have addressed the issue offer helpful examples as well. See United States v. Jenkins, 452 F.3d 207, 213 (2d Cir. 2006) ("[W]hen police officers stop a vehicle on a reasonable, albeit erroneous, basis and then realize their mistake" they may "approach[] the vehicle and apprise[] the vehicle's occupants of the situation."); United States v. McSwain, 29 F.3d 558, 561(10th Cir. 1994) ("Trooper Avery stopped Mr. McSwain for the sole purpose of ensuring the validity of the vehicle's temporary registration sticker. Once Trooper Avery approached the vehicle on foot and observed that the temporary sticker was valid and had not expired, the purpose of the stop was satisfied. Trooper Avery's further detention of the vehicle to question Mr. McSwain about his vehicle and travel itinerary and to request his license and registration exceeded the scope of the stop's underlying justification.").

In this case Officer Ross had no justification to pursue an investigatory stop that extended to a request to see Holly's identification. The evidence collected as a result of the stop, including the marijuana seized during the search and Holly's subsequent admission that he owned the marijuana, was therefore inadmissible under the Fourth Amendment. The trial court thus erred in admitting the evidence. Accordingly we reverse the judgment of the trial court on this issue.

**Conclusion**

The judgment of the trial court is reversed and this cause is remanded.

Dickson and Boehm, JJ., concur.
Shepard, C.J., dissents with separate opinion.
Sullivan, J., dissents with separate opinion in which Shepard, C.J., joins.

SHEPARD, C.J., dissenting.

I can acknowledge the pertinence of the smattering of decisions cited by the majority and still see them as standing in tension with Fourth Amendment principles. The U.S. Supreme Court has indicated that in calculating Fourth Amendment reasonableness in the context of vehicle stops and resulting brief detention, the interests of the state tend to be weighed more heavily, and those of the motorist less heavily, where the subject matter concerns the privilege of driving. *See* Michigan Dept. of State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Motorists whose careless or reckless driving is so serious as to lead to license suspension constitute a genuine threat to the safety of their fellow citizens, few of whom will appreciate that today's decision places them at greater risk of injury. As Chief Justice Roberts observed a few weeks ago about other forms of dangerous driving, it will be difficult "to explain to the family" of an innocent injured party that the police had a chance to prevent the injury but were powerless to act. Virginia v. Harris, 130 S.Ct. 10, 12 (2009) (Roberts, C.J., dissenting from denial of certiorari).

The majority's decision appears rooted in the concern that police officers would otherwise abuse their authority and engage in discriminatory enforcement of traffic laws. Justice Ginsburg described this concern as ensuring that police officers are not using traffic stops merely as a means to conduct "fishing expeditions." Ohio v. Robinette, 519 U.S. 33, 41, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). Here, it is not disputed by the majority that the initial stop of the vehicle was a valid one.

Likewise, there is no allegation that the officer's request for Holly's identification substantially extended the stop. The Supreme Court has expressly rejected establishing any rigid limitation on *Terry* stops like the one in this case. Instead, the issue is how diligently the officer pursues his or her investigation. United States v. Sharpe, 470 U.S. 675, 685-86, 105 S.Ct. 1568, 84 L.Ed.2d 608 (1985). On this point, the Court has said:

> While it is clear that the brevity of the invasion of the individual's Fourth
> Amendment interests is an important factor in determining whether the seizure is
> so minimally intrusive as to be justifiable on reasonable suspicion, we have

1

> emphasized the need to consider the law enforcement purpose to be served by the stop as well as the time reasonably needed to effectuate those purposes.

Id. at 684, 105 S.Ct. at 1568. The Fifth Circuit in recognizing that an officer may request a driver's license, insurance papers, vehicle registration, run a computer check thereon, and issue a citation has "'reject[ed] any notion that a police officer's question [of a detainee during a traffic stop], *even on a subject unrelated to the purpose of a stop*, is itself a Fourth Amendment violation.'" United States v. Brigham, 382 F.3d 500, 508 (5th Cir.2004) (en banc) (quoting United States v. Shabazz, 993 F.2d 431, 437 (5th Cir.1993)) (emphasis in original). The Brigham court pointed out that it is the detention, not the questioning, that is the evil at which *Terry's* second prong is aimed.

Here, the officer executed a valid traffic stop and his request for Holly's identification was still within the routine procedures of standard stops. Absent any evidence that this minimal request would have otherwise prolonged the stop, even had Holly possessed a driver's license, I can see no evil in the request.

2

**Sullivan, Justice, dissenting.**

The cases cited by the majority stand for the proposition that once officer Ross approached Holly and observed that Holly did not match the description of the registered owner, Officer Ross's reasonable suspicion evaporated and his subsequent request for Holly's identification contravened the prohibitions of the Fourth Amendment. While I acknowledge that the majority correctly marshals existing authority on this subject, the majority does not cite to any authority binding on this court. In my view, there is a consensus of authority more instructive, arising in the context of a police officer's "community caretaking function," that stands for the proposition that the Fourth Amendment is not violated when an officer requests a driver's license to run a status check without probable cause or reasonable suspicion provided there is an initial, valid police-driver contact.

In State v. Ellenbecker, 464 N.W.2d 427 (Wis. Ct. App. 1990), a police officer stopped behind a disabled vehicle on the side of the road to see if the occupants needed his assistance. Although he ultimately determined that the driver and passenger did not need his help, he nevertheless asked the driver, Ellenbecker, for his driver's license. A status check on the license revealed that it had been revoked. Ellenbecker was subsequently arrested, and during a search of both Ellenbecker and his car, the officer discovered, among other things, packets of marijuana, vials of hash oil, and twenty-nine packets of LSD. The issue in Ellenbecker was "whether an officer who learns that a motorist needs no assistance may still demand to see a driver's license and conduct a status check at the scene." Id. at 428. The court concluded that where an officer acts pursuant to his community caretaker function, if under the totality of the circumstances an objectively reasonable basis for the stop exists, "the public interest in permitting an officer to request a driver's license and run a status check during a lawful police-driver contact outweighs the minimal intrusion on the driver." Id.

Relying on the holding and reasoning of Ellenbecker, many of our sister jurisdictions have held that, generally, when a driver is validly stopped for a lawful reason, it is reasonable for the officer to ask for identification, registration, and proof of insurance and conduct a routine sta-

1

tus check to ensure the validity of the documents.[5] See State v. Baez, 894 So. 2d 115, 117 (Fla. 2004) (concluding that where a police officer obtained a driver's license in his caretaking capacity as the result of a consensual encounter, "the police officer could then retain what he was consensually given long enough to do the computer check[]" of the validity of the license); O'Donnell v. State, 409 S.E.2d 579, 582 (Ga. Ct. App. 1991) ("[C]onsidering [the driver] had voluntarily stopped in a public rest area, parked, and laid down in the vehicle late at night, causing [the] Trooper to have a legitimate concern primarily regarding his medical status . . . it was not unreasonable within the meaning of the Fourth Amendment for [the] Trooper thereafter to initiate promptly a routine and limited inquiry to determine the [driver]'s identity.") (emphasis omitted); State v. Aguinaldo, 782 P.2d 1225, 1229 (Haw. 1989) ("We[] . . . hold that the police has the power and authority to demand from the driver of a vehicle the production of both [a driver's license and proof of insurance] whenever the vehicle is validly stopped."); State v. Godwin, 826 P.2d 452, 456 (Idaho 1992) ("[A] police officer's brief detention of a driver to run a status check on the driver's license, after making a valid, lawful contact with the driver, is reasonable for purposes of the [F]ourth [A]mendment."); State v. Brunelle, 766 A.2d 272, 274 (N.H. 2000) (holding that an officer's request for the driver's license and vehicle registration of the driver of a disabled vehicle was part of a limited community caretaking exception, and such request was reasonable "in the event that any questions about the vehicle or [the trooper's] contact with the owner subsequently arose"); State v. Reynolds, 890 P.2d 1315 (N.M. 1995) (holding that an officer who stopped a motorist for safety reasons reasonably detained the vehicle and its passengers for the purpose of obtaining the driver's identification, registration, and proof of insurance); State v. Tourtillott, 618 P.2d 423, 434-35 (Or. 1980) ("We are aware of no prohibition against an officer asking a driver for an operator's license when a driver is validly stopped, whatever be the reason for the stop. Oregon motorists are required to have a valid operator's license in their possession while operating a car and, upon demand, to show it to any peace officer.").

---

[5] The following citations reflect positions of courts that differ on whether asking a driver for identification, where the impetus for the stop was the police officer's concern for the safety of the vehicle's occupants, constitutes a seizure. I assume for the sake of argument that when the police are engaged in a community caretaker capacity, the Fourth Amendment and its attendant protections against unreasonable searches and seizures are entirely applicable.

It seems to me that the views expressed in these cases provide better guidance than those cited by the majority in evaluating an officer's request for identification after making valid, lawful contact with the driver. There are several justifications for permitting a police officer to ask for a driver's license under these circumstances. In making any stop, whether the stop is initiated to enforce the traffic laws or to carry out the officer's community caretaker function, an officer should be allowed to identify, with certainty, the person with whom the officer is dealing. This is necessary to protect officers from danger, to prepare accurately any required reports concerning the officer's contact with the motorist, and to allow officers to adequately respond to allegations of illegal conduct or improper behavior. See Ellenbecker, 464 N.W.2d at 430 (exhorting that "even seemingly innocent activity, such as refueling a disabled car, could later turn out to be theft of a car that was left on the shoulder of the highway.") Moreover, as the Supreme Court concluded in Delaware v. Prouse, 440 U.S. 648 (1979), "the States have a vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are observed." Id. at 658. Police, acting upon reasonable suspicion of violations of the traffic laws, may "stop[] an automobile and detain[] the driver in order to check his driver's license and the registration of the automobile[.]" Id. at 663. Since a license is a statement that the driver can be expected to comply with the state's requirements for safe driving, allowing police to request a driver's license during a valid, lawful contact provides an added deterrent effect.

Even if there is a legitimate public interest in requesting a driver's license and running a status check under the circumstances presented here, that interest must outweigh the nature of the intrusion in order to pass the Fourth Amendment test of reasonableness. See United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975) ("As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of such seizures [brief detentions short of traditional arrest] depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers."). The intrusion here was minimal. Given the fact that there is no privacy interest in public documents like driver's licenses and that the detention period was de minimis, requesting such documents after the lawful stop was reasonable under the totality of the circumstances. In point of fact, the initial stop in this

3

case was lawful, and just as Chief Justice Shepard notes, there is no allegation that the officer's request for Holly's identification substantially extended the stop.

Furthermore, I am aware that, under Delaware v. Prouse, police officers may not stop drivers at random to check, inter alia, identification documents. However, the authority in support of my position does not authorize such a result. As the Ellenbecker court pointed out, "[p]olice officers do not have unfettered discretion to stop drivers and request a display of a driver's license." 464 N.W.2d at 430. This case does not concern an instance of unfettered discretion. Officer Ross's brief detention of Holly to run a status check on his driver's license occurred only after the officer had first made a valid, lawful contact with the driver – initial contact that the majority concedes was reasonable for purposes of the Fourth Amendment.

Applying the analytical framework contained in the caretaking cases, I have little difficulty concluding that Officer Ross's request for Holly's identification was reasonable and did not violate the Fourth Amendment of the U.S. Constitution or Article I, Section 11 of the Indiana Constitution. The officer's initial contact with Holly was to determine whether he was the registered owner. His further request of Holly's license and his check on the status of that license constituted a very limited further encroachment upon any privacy interest protected by the Fourth Amendment.

For these reasons, I respectfully dissent.

Shepard, C.J., joins.

4