## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 09 2020, 8:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Lisa M. Johnson
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Anthony A. Parish, <br> *Appellant-Petitioner,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Respondent* | September 9, 2020 <br><br> Court of Appeals Case No. 20A-PC-44 <br><br> Appeal from the Allen Superior Court <br><br> The Honorable Frances C. Gull, Judge <br><br> Trial Court Cause No. 02D05-1401-PC-18 |

**May, Judge.**

Anthony A. Parish appeals the denial of his petition for post-conviction relief. Parish argues his trial counsel and appellate counsel rendered ineffective assistance. We affirm.

## Facts and Procedural History

The underlying facts were stated in Parish's direct appeal:

> In the early morning hours of August 25, 2008, Fort Wayne police found Antoine Woods shot to death in the front seat of his car near "the Dove Shack" bar. Parish had been partying with friends that night at a carwash near the bar and was seen in possession of a .38 caliber handgun. In fact, Parish was videotaped that night holding the handgun. Between 12:30 a.m. and 12:45 a.m., Parish left with some of the people at the carwash to go to the Dove Shack bar. Parish returned approximately one hour later wearing a silver necklace with a round charm that looked identical to a necklace that Woods wore. Parish told his friends, "I did a petty murder." Trial Tr. p. 177.

> Nine days after the murder, on September 3, 2008, Fort Wayne Police Officer Raquel Foster ("Officer Foster") was in her patrol car when she observed a vehicle make a turn without using a turn signal. Officer Foster initiated a traffic stop of the car and, although the windows of the car were darkly tinted, recognized the driver as Parish because the driver's side window was down. Officer Foster immediately called for backup because Fort Wayne police officers were on "high alert" that Parish was armed. Parish was also a suspect in several shootings, including the murder of Woods. And approximately two weeks prior to the stop, an officer in the "gang unit" of the police department had warned other officers that Parish had threatened to kill the next police officer he encountered and claimed that his cocaine

or methamphetamine use would numb him to any pain if he got into a shootout with the police.

Before any backup arrived, Officer Foster quickly approached the car and told Parish to step out of the vehicle. Parish did not immediately comply, but asked Officer Foster why she did not want to see his driver's license, vehicle registration, or proof of insurance. Officer Foster told Parish that she knew who he was and repeated her instructions to step out of the car. This time, Parish slowly took off his seat belt and got out of his car. Officer Foster took Parish to the back of his car and began a pat-down search. Before Officer Foster could finish the pat-down search, Officer Drummer arrived on the scene, handcuffed Parish, and started another pat-down search.

While Parish was handcuffed and being patted down by Officer Drummer, Officer Foster began a protective search of Parish's car. At the suppression hearing, Officer Foster explained that she was specifically looking for a handgun because of the reports that Parish was armed. Officer Foster looked under the seats, between the seat and the console, and behind the seats, or as she explained at the suppression hearing, "wherever I could reach." Suppression Tr. p. 11.

When Officer Foster attempted to open the glove box, it was locked. She therefore "immediately" pulled the key from the ignition and unlocked the glove box "without even thinking." *Id.* at 11-12. Inside, she found a Smith and Wesson revolver, a small scale, and a plastic baggie with a leafy green substance that Officer Foster identified as marijuana. Officer Foster explained her reasons for the search of the glove box by stating that, because she had pulled Parish over for a traffic stop, "I was just, within his reach, anything, because if I put him back into that car, anything that was within his reach." *Id.* at 12.

Officer Foster confiscated the handgun and contraband from the glove box and informed Officer Drummer of what she had found. They then secured Parish by placing him inside one of the patrol cars. Officer Foster ran a check on Parish's license, the vehicle registration, and the VIN number, which revealed no problems. Despite the fact that she had just found Parish in possession of handgun and marijuana, Officer Foster simply issued a citation to Parish for failure to use a turn signal, put him back into his car, and let him go.

Some time after the traffic stop, Parish told one of his companions that the police had to let him go because "he had a license," but that the police had recovered "[t]he gun, .38 revolver." Trial Tr. p. 178. Eventually, the bullets that were recovered from the murder scene were found to ballistically match the revolver Officer Foster took from Parish's glove box.

\* \* \* \* \*

On January 8, 2009, four months after the traffic stop, the State charged Parish with murder, felony murder, Class A felony robbery resulting in serious bodily injury, and Class C felony carrying a handgun without a license, with all charges stemming from the shooting death of Antoine Woods. Parish filed a motion to suppress on May 15, 2009, seeking to exclude the evidence seized during the search of his car. The trial court held a hearing on this motion on June 26, 2009, and denied the motion at the conclusion of the hearing.

A jury trial was held on November 17 and 18, 2009. At the conclusion of the trial, the jury found Parish guilty as charged. At a sentencing hearing held on December 18, 2009, the trial court vacated the felony murder conviction, as it "merged" with the murder conviction, and entered judgment of conviction only on the murder conviction. The trial court entered judgment of

conviction for robbery as a Class B felony based on the use of the deadly weapon, and entered judgment of conviction for carrying a handgun without a license as a Class A misdemeanor. The trial court sentenced Parish to sixty-five years on the murder conviction, twenty years on the robbery conviction, and one year on the carrying a handgun without a license conviction, and ordered all sentences to be served consecutively, for an aggregate sentence of eighty-six years.

*Parish v. State*, 936 N.E.2d 346, 347-49 (Ind. Ct. App. 2010), *trans. denied*.

[3] On direct appeal, Parish alleged the trial court abused its discretion in admitting the handgun found in Parish's glovebox into evidence because Officer Foster did not have a reasonable fear for her safety "that would justify a protective search of the passenger compartment of the car[,]" *id*. at 349, and thus the search violated the Fourth Amendment of the United States Constitution.[1] We disagreed:

At the time of the traffic stop, Parish was a suspect in several shootings, including a homicide, and the police were on high alert that Parish was armed. Indeed, a "gang unit" officer had warned other officers that Parish had threatened to kill the next police officer he encountered and was even taking drugs in preparation for a shootout with the police. In addition, when Officer Foster first approached Parish's car and told him to step out of the vehicle, Parish did not immediately comply. He instead asked Officer Foster why she did not want to see his driver's license and registration. Only when Officer Foster explained to Parish that she knew who he was and again told

---

[1] Parish did not argue on appeal that the search violated his rights against unlawful search and seizure under Indiana Constitution Article 1, Section 11.

him to step out of the car did he slowly take off his seat belt and exit the car.

Under these facts and circumstances, a reasonably prudent person in Officer Foster's position would be warranted in the belief that her safety was in danger. Officer Foster was therefore justified in searching the passenger compartment of Parish's car, limited to those areas in which a weapon might be placed or hidden.

*Id*. at 350.

[4] Parish filed a pro se petition for post-conviction relief on January 14, 2014, and his petition was twice amended by counsel on March 22, 2018, and January 3, 2019. In his petition for post-conviction relief, Parish alleged his trial counsel, John Bohdan, was ineffective at the jury trial by (1) failing to object to the admission of a video and a still photograph from that same video, both of which showed Parish holding a handgun; (2) eliciting damaging and prejudicial hearsay from Officer Foster; (3) failing to impeach witness Rico Parrish ("Rico") with prior inconsistent statements; (4) failing to present reputation and opinion evidence showing that Rico was not credible; and (5) failing to present evidence that Rico received favorable treatment from the State in Rico's criminal cases.

[5] Parish also argued that an affidavit executed on December 14, 2018, by Rico, in which he alleged his testimony at Parish's jury trial was not entirely truthful, constituted newly discovered evidence entitling Parish to a new trial. The second portion of Parish's post-conviction petition alleged that Bohdan, in his

role as appellate counsel, was ineffective for failing to challenge the search of the locked glove box under Article 1, Section 11 of the Indiana Constitution. The post-conviction court held an evidentiary hearing on the issues raised on February 15, 2019, and denied Parish's petition on December 31, 2019.

# Discussion and Decision

[6] Post-conviction procedures do not constitute a super-appeal, and not all issues are available to the petitioner. *Williams v. State*, 706 N.E.2d 149, 153 (Ind. 1999), *reh'g denied*, *cert. denied* 529 U.S. 1113 (2000). Where the postconviction court has entered findings of fact and conclusions of law, "we accept the findings of fact unless clearly erroneous, but accord no deference [to] conclusions of law." *Turner v. State*, 974 N.E.2d 575, 581 (Ind. Ct. App. 2012), *trans. denied*. We will thus reverse the postconviction court's decision only if the evidence is without conflict and leads to a conclusion opposite that reached by the postconviction court. *Id.* at 581-82. Any challenge to a conviction must be based on grounds enumerated within the post-conviction rules. Indiana Post-Conviction Rule 1(1). Therefore, if an issue was known and available to the petitioner but not raised on direct appeal, it must be considered waived. *Rouster v. State*, 705 N.E.2d 999, 1003 (Ind. 1999), *reh'g denied*.

[7] A criminal defendant may raise a claim of ineffective assistance of counsel in a postconviction relief petition. *Timberlake v. State*, 753 N.E.2d 591, 597 (Ind. 2001), *reh'g denied*, *cert. denied* 537 U.S. 839 (2002). The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal prosecution

"the assistance of counsel for his defense," U.S. Const., Am. VI, and this guarantee requires counsel's assistance be effective. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052 (1984), *reh'g denied*.

## 1. Ineffective Assistance of Trial Counsel

"[I]solated poor strategy, inexperience, or bad tactics does not necessarily constitute ineffective assistance of counsel," *McCullough v. State*, 973 N.E.2d 62, 74 (Ind. Ct. App. 2012), *trans. denied*, and there is a strong presumption that counsel exercised reasonable professional judgment and rendered effective assistance. *Strickland,* 466 U.S. at 690. Counsel's decisions are assessed objectively, in view of what a reasonable, minimally-competent attorney could have chosen to do or not do in the circumstances; this inquiry should not involve hindsight or evaluate counsel's subjective opinions or beliefs. *Harrington v. Richter*, 562 U.S. 86, 106-07 (2011).

The petitioner must demonstrate ineffective assistance of trial counsel on both grounds of the two-part test outlined by the United States Supreme Court in *Strickland*: (1) counsel rendered deficient performance, meaning counsel's representation fell below an objective standard of reasonableness as gauged by prevailing professional norms; and (2) counsel's deficient performance prejudiced the defendant, which gave rise to a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 670. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Because both prongs of the *Strickland* test constitute "separate and independent inquiries," *Landis v. State*, 749 N.E.2d 1130, 1134 (Ind. 2001), failure to demonstrate either deficient performance or prejudice is fatal to an ineffective-assistance claim. *Vermillion v. State,* 719 N.E.2d 1201, 1208 (Ind. 1999), *reh'g denied*. Accordingly, if it is more efficient to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed. *Strickland,* 466 U.S. at 697.

### *A. Admission of Video and Photograph into Evidence*

[10] Parish first asserts Bohdan, in his role as trial counsel, was ineffective because he did not object to the admission of a video showing Parish holding a handgun on the night of Woods' murder ("Exhibit 5") and a still photograph taken from the video ("Exhibit 6"). On appeal, Parish contends, "Parish was prejudiced by counsel's failure to object to exhibits 5 and 6. But for counsel's failure to object, the jury would not have seen irrelevant and prejudicial images of Parish holding a handgun." (Br. of Appellant at 26.) Thus, we must consider if there existed reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 670.

[11] During Parish's trial, Rico testified that Parish spent most of the day with him at a car wash on the day of Woods' shooting. That day, Rico stated, he and Parish made a rap video while at the car wash. Exhibit 5, later admitted into evidence, did not have a time or date stamp but depicted a man in a gold baseball cap holding a gun, and Rico testified the man in the video was Parish.

Parish argues that had Bohdan objected to the admission of Exhibit 5 and Exhibit 6 at trial, he would have succeeded at excluding them from evidence:

> Rico Parrish testified that the video was made shortly before the offense, and that the handgun shown in the video was "a .38 revolver." Exhibits 5 and 6 were irrelevant and prejudicial. There is no evidence that the handgun shown in those exhibits was used in the crime, and there is no evidence that Rico was qualified to identify a .38 revolver.

(Br. of Appellant at 26.) "Evidence that the defendant had access to a weapon of the type used in the crime is relevant to a matter at issue other than the defendant's propensity to commit the charged act." *Myers v. State*, 33 N.E.3d 1007, 1108 (Ind. Ct. App. 2015) (quoting *Rogers v. State*, 897 N.E.2d 955, 960 (Ind. Ct. App. 2008), *trans. denied*), *reh'g denied*, *trans. denied*. Furthermore, whether the weapon to which the defendant had access was the same weapon used in the offense "goes to the weight to be attributed to the evidence, not its admissibility." *Id.* *See also Dickens v. State*, 754 N.E.2d 1, 4 (Ind. 2001) (evidence that defendant was seen carrying a gun two days before the charged murder committed with a gun was relevant to prove opportunity, and probative value outweighed prejudicial effect).

[12] Although Bohdan may have been able to object to Rico's identification of the type of gun shown in State's Exhibit 5 and 6 because there was "no evidence that Rico was familiar with firearms or qualified to identify them," (Br. of Appellant at 24), Parish has failed to demonstrated prejudice because Bohdan could not have "successfully objected to the exhibits themselves." (PCR App.

Vol. II at 194.)  *See Ewing v. State*, 719 N.E.2d 1221, 1225 (Ind. 1999) (photographs depicting matters that a witness describes in testimony are generally admissible).

[13]     Further, the jury was eventually able to compare the weapon depicted in the video and photograph with the firearm seized from Parish during his traffic stop in order to assess for itself the similarity of the weapons.  We agree with the post-conviction court's reasoning that:

> The evidence of Petitioner's possession of a gun, not shown to be distinguishable in appearance from the murder weapon, at a time shortly before the murder, was relevant to show that Petitioner had access to a weapon of the type used to commit the murder; and the high probative value of that evidence was not outweighed by any possible prejudicial effect.

(PCR App. Vol. II at 194.)  Furthermore, Indiana Rule of Evidence 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pre-trial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Therefore, because an objection to the admission of the video and photograph would likely not have been sustained, Parish has not shown he was prejudiced by Bohdan's decision to not object to the admission of the video and photograph, which demonstrated Parish's access to and knowledge of the weapon used in the Woods' murder. *See Curtis v. State*, 905 N.E.2d 410, 418 (Ind. Ct. App. 2009) (counsel is not rendered inadequate for failing to make a futile objection; a defendant must show that had an objection been made the court would have had no choice but to sustain it), *trans. denied*.

### B. Officer Foster's Testimony

Parish next argues that Bohdan violated professional norms when he solicited "damaging, prejudicial, hearsay testimony" from Officer Foster on cross-examination. (Br. of Appellant at 8.) During trial, Officer Foster testified that she stopped Parish for a traffic violation, conducted a search of his vehicle, and discovered a loaded .38 revolver upon search of his locked glove box. During that direct examination, the State did not ask Officer Foster to elaborate on her reasons for searching the glove box or to discuss concerns about her safety. Bohdan, however, on cross-examination of Officer Foster elicited the following testimony:

> Q: When you stopped the vehicle that day, you did so with the belief that he may have some kind of firearm on or about his person, is that correct?
>
> A: No, not with that belief.

Q: You did not?

A: No, not necessarily.

Q: Am I correct that in previous testimony that you told us that you were acting on a belief that Mr. Parish was known to possess handguns?

A: Mr. Parish was known to be armed with a weapon.

Q: And that belief was based on some tip that had been given to another officer within your department, is that correct?

A: It was—he was known to be armed with a weapon because of his involvements, because of other information. We had received a tip from a fellow police officer.

(Prior Trial Tr. Vol. II. at 270.) This, Parish argues, "opened the door" for Officer Foster to testify that: (1) she was "very scared" of Parish; (2) she knew who he was and knew about his involvements; (3) she immediately called for backup because she was afraid of Parish; (4) Parish was a suspect in several shootings; (5) Parish was known to be armed; (6) Parish was suspected of being involved in gang activity; and (7) Parish had threatened to shoot the next police officer he encountered. (Br. of Appellant at 28.)

[15] Parish further alleges that Officer Foster's testimony may have caused jurors to make the "forbidden inference" that evidence of prior wrongful conduct demonstrated Parish's guilt in the present offense. (*Id*. at 16.) However, Bohdan in his cross-examination of Officer Foster also elicited facts that

portrayed Parish in a positive light. For example, Parish was cooperative when he was pulled over, he did not harm Officer Foster in any way, he had not threatened her directly, Officer Foster's knowledge of Parish's threats toward law enforcement stemmed from a tip she received from another officer, and the weapon introduced into evidence had been removed from Parish's locked glove box during a search of his vehicle. (Prior Trial Tr. Vol. II. at 265-271.)

We do not consider Officer Foster's testimony highly prejudicial. Rather, Bohdan's strategy elicited testimony that potentially could have assisted Parish, such as the emphasis on Parish's cooperation with Officer Foster during the traffic stop. Recognizing that "a valid defense strategy may involve the admission of evidence that is objectionable," *Grinstead v. State*, 845 N.E.2d 1027, 1034 (Ind. 2006), we agree that "although egregious errors may be grounds for reversal, we do not second-guess strategic decisions requiring reasonable professional judgment even if the strategy or tactic, in hindsight, did not best serve the defendant's interests." *State v. Moore*, 678 N.E.2d 1258, 1261 (Ind. 1997), *reh'g denied*, *cert. denied* 523 U.S. 1079 (1998). Therefore, as Bohdan's decision to elicit such testimony from Officer Foster was a valid strategy and Parish has not demonstrated he was prejudiced by that strategy, we conclude Parish did not receive ineffective assistance of counsel in this regard.

### C. State's Witness Rico Parish

### 1. Impeachment by Opinion and Reputation

Indiana Evidence Rule 608(a) provides:

> A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked.

Testimony from a witness, regarding the witness's opinion about another witness's character for truth and veracity or lack thereof, is admissible under that rule. Ind. Evid. R. 608(a). Parish asserts "[t]rial counsel's failure to investigate and present available reputation and opinion evidence, regarding Rico's character for lack of truthfulness and veracity, violated prevailing professional norms." (Br. of Appellant at 31.) In support, Parish emphasizes that Rico had a criminal history, that such people have reputations for being dishonest, and that other people who know Rico also considered him to be dishonest. *Id*. Parish's argument primarily relies on his then-girlfriend Dominique Gooden, who only knew Rico indirectly as Parish's "cousin" and who testified in support of Parish's alibi on the day of Woods' murder. (PCR Ex. 34 at 36.) Gooden in her deposition stated that she "used to hear stuff about Rico all the time." (*Id*.) This, Parish argues, implies Rico's propensity toward untruthfulness and should have raised a red flag as to his credibility.

[18] However, Indiana Evidence Rule 602 explains that a witness who offers testimony toward a particular matter, such as offering a personal perception of Rico's untruthfulness, must demonstrate that their opinion is based on some personal knowledge the witness has about the subject. Parish has failed to

demonstrate prejudice because he has not shown a reasonable probability that testimonies from eight witnesses, who all had varying degrees of knowledge of Rico's reputation, would have cast doubt on Parish's guilt in light of other incriminating evidence. Based thereon, we conclude Bohdan did not render ineffective assistance of counsel based on this argument.

### 2. Impeachment by Prior Inconsistent Statement

[19] Parish claims that Bohdan could have impeached Rico's trial testimony based on Rico's inconsistent statements because "a witness's credibility can be attacked on cross-examination with evidence of a prior inconsistent statement." *Griffith v. State*, 31 N.E.3d 965, 969-70 (Ind. 2015). Specifically, Parish points to Rico's trial testimony, during which Rico stated that he had seen and been with Parish on the night of Woods' murder before and after Parish left for the Dove Shack bar. This testimony conflicted with Rico's pre-trial statement to Detective Lorna Russell, during which Rico told her he had received two calls from Parish, before and after Woods' murder; during the first call, Rico claimed Parish told him he was going to the Dove Shack, and then during the second call, Rico claimed Parish told him he had committed a "petty murder" and shot a person inside a vehicle. (PCR Ex. 30.) Parish argues Bohdan should have recognized this apparent contradiction and brought it to light during his cross-examination of Rico, in order to cast doubt on Rico's credibility.

[20] We agree with the post-conviction court that the affidavit simply demonstrates inconsistency in Rico's evidence about how he had come by his knowledge that Parish had murdered Woods. (PCR App. Vol. II at 195.) Further, had Bohdan

brought the contradiction to light, the jury would still have heard that Parish went to the Dove Shack that night, shot Woods inside a vehicle there, took and wore Woods' necklace, and then admitted to committing a "petty murder." (Prior Trial Tr. Vol. I at 171-173, 174-177.) We cannot say Parish was clearly prejudiced, because the jury inevitably would have heard the substance of Rico's testimony regardless of the inconsistent means by which Rico acquired the information from Parish. *See Woodson v. State*, 961 N.E.2d 1035, 1042 (Ind. Ct. App. 2012) (the method of impeaching witnesses is generally a tactical decision that does not amount to ineffective assistance), *trans. denied*.

### 3. Evidence of Alleged Bias

Parish notes that two months after Woods' murder, Rico was charged with aggravated battery, battery, and criminal recklessness. (PCR Ex. 41.) The State dismissed those charges on October 17, 2008, a few months prior to the date the State charged Parish with the crimes of which he was convicted. Parish argues that Bohdan was ineffective for failing to use these facts to claim that Rico was lying in order to prevent the State from refiling the charges. The only evidence pointing toward Rico's fear of his charges being refiled is Rico's 2018 affidavit attempting to recant his trial testimony by saying that detectives promised him that charges would be dismissed if he told them what they "wanted to hear" and threatened to refile the charges unless he continued to say what they "wanted to hear." (PCR Ex. 40.)

Parish also alleges that, even if the State did not threaten to refile Rico's charges, there was a reasonable degree of probability that Rico was biased in

favor of the State and that evidence of a benefit extended toward a witness by the State in another case is relevant to demonstrating bias. As noted by the post-conviction court, we find no evidence suggesting Rico received favorable treatment from the State in exchange for his testimony or Rico was threatened in any way to tailor his testimony favorably toward the prosecution in the present case. (PCR App. Vol II at 196.) *See Tolliver v. State,* 922 N.E.2d 1272, 1286 (Ind. Ct. App. 2010) (trial court did not err in limiting cross-examination of witnesses for bias on basis of alleged deals and charges not shown to have existed, after trial court found no evidence or indication that charges were being withheld or used in consideration for witnesses' testimony).[2]

## 2. Ineffective Assistance of Appellate Counsel

---

[2] Parish notes that if a reviewing court finds more than one instance of deficient performance by counsel, the court must then assess the resulting cumulative prejudice. As we did not hold that Parish was prejudiced based on any alleged mistakes committed by Attorney Bohdan, we decline to re-assess Parish's arguments for cumulative prejudice. As explained by the post-conviction court:

> If not for Attorney Bohdan's claimed errors as raised in the Amended Petition, Petitioner would still have been shown to have possessed a weapon that looked like the murder weapon shortly before the murder (Conclusions of Law, 6-7). Rico Parrish would have testified without contradiction that Petitioner admitted to a "petty murder" shortly afterward, notwithstanding any questions about the circumstances under which Rico Parrish heard the admission (*id*. at 9). Petitioner would still have been shown to have possessed the murder weapon nine days after the murder. (Parish, 936 N.E.2d at 348), and a claim under the Indiana Constitution would not have succeeded in excluding the evidence that he had the murder weapon (Conclusions of Law, 16-20). Evidence would still have shown that Petitioner possessed Antonine Woods's necklace and medallion after the murder, and that Petitioner's grandmother displayed evasiveness and possible dishonesty when the necklace and medallion were found in her purse, suggesting knowledge that the discovery would incriminate Petitioner (Findings of Fact, 7, 18-19). Finally, Petitioner would still have presented false alibi evidence (*id*, 20-22), for the Amended Petition does not assert that Attorney Bohdan was ineffective in any way regarding the alibi defense.

(PCR App. Vol. II at 198.) We are not persuaded that Attorney Bohdan provided ineffective assistance at trial or that any alleged deficiencies resulting from his judgment and trial strategy resulted in irreparable prejudice to Parish.

The standard for determining the effectiveness of counsel's assistance is the same for both trial and appellate counsel. *Wine v. State,* 147 N.E.3d 409, 421 (Ind. Ct. App. 2020). Appellate counsel's failure to raise an issue that would not have been successful does not amount to ineffective assistance. *Mauricio v. State,* 652 N.E.2d 869, 872-873 (Ind. Ct. App. 1995), *reh'g denied, trans. denied.* Appellate assistance will be considered deficient, however, if the omitted issue was clearly stronger than the issues presented. *Bieghler v. State,* 690 N.E.2d 188, 193 (Ind. 1997), *cert. denied* 525 U.S. 1021 (1998). To prove prejudice in a claim of ineffective assistance, a convicted defendant must show a reasonable probability that the result of the proceeding would have been different if not for counsel's errors. *Taylor v. State,* 840 N.E.2d 324, 331 (Ind. 2006).

## *A. Arguments Raised on Direct Appeal*

Parish appealed his conviction with the assistance of the same attorney who represented him at trial, Bohdan. On direct appeal, Parish claimed the search of his locked glove box during the traffic stop was improper under the Fourth Amendment of the United States Constitution[3] and argued any evidence found during that search should have been suppressed. *Parish,* 936 N.E.2d at 349. Specifically, Parish acknowledged case law holding that an officer with a reasonable suspicion that a motorist is dangerous and able to gain immediate control of a weapon may conduct a protective search of the passenger compartment of the vehicle without a warrant. Nonetheless, Parish claimed

---

[3] On direct appeal, Parish did not assert an argument under Article 1, Section 11 of the Indiana Constitution. *Parish,* 936 N.E.2d at 352 n.5.

Officer Foster had no reasonable fear for her safety. *Id*. at 352. Thus, Parish argued, the search of his car was a pretext for searching for evidence of other crimes, particularly because Parish was not subsequently detained for the weapon or contraband found in his locked glovebox. *Id*.

[25] During trial, on re-direct examination, Officer Foster testified without objection that Parish was known to be armed with a handgun "because of his involvements, because of other information," such as "a tip from fellow police officers." (Prior Trial Tr. Vol. II at 270.) Upon further inquiry, Officer Foster explained:

> Mr. Parish had been listed as a suspect in a recent homicide, he'd been listed as a suspect in several shootings. He was known to be party armed [sic]. He had click [sic] or gang activity alerts, he had recently made a threat to shoot the next police officer that he had encountered, so yes, Mr. Godfrey, when I made that stop I was very much afraid.

(*Id*. at 271.)

[26] On direct appeal, our court determined under the Fourth Amendment that a "reasonably prudent person in Officer Foster's position would be warranted in the belief that her safety was in danger. Officer Foster was therefore justified in searching the passenger compartment of Parish's car, limited to those areas in which a weapon might be placed or hidden." *Parish,* 936 N.E.2d at 350. Although the majority of our court affirmed Parish's conviction and sentence, Judge Riley dissented because she believed Officer Foster's search of the locked glove box was unsustainable under the Fourth Amendment. *Id*. at 353. Judge

Riley relied on *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710 (2009), which limited an unwarranted search of a vehicle to only that portion of a passenger compartment that was within a defendant's reaching distance. Judge Riley's dissent emphasized that, in *Gant*, the passengers had been removed from the car, handcuffed, and placed in separate police cars, such that the officer's safety could not have been threatened because the passengers were not able to access any possible weapons in the car. She concluded that, in light of the parallels between *Gant* and Parish, Officer Foster's search was not constitutional. *Id*. at 354.

### *B. Analysis Under Article 1, Section 11 of Indiana Constitution*

Parish argues Bohdan, in his capacity as appellate counsel, was ineffective because he did not argue Officer Foster's foray into Parish's glove box violated Article 1, Section 11 of the Indiana Constitution, which deals with unlawful search and seizure. Though the text of the search and seizure clause of the Indiana Constitution is similar to the Fourth Amendment to the United States Constitution, our Indiana Supreme Court has articulated a separate analysis. *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005). The State has the burden of showing that, given the totality of the circumstances, the intrusion was reasonable. *Mitchell v. State*, 745 N.E.2d 775, 786 (Ind. 2001).

"In determining reasonableness under [Article 1,] Section 11, we recognize that Indiana citizens are concerned not only with personal privacy but also with safety, security, and protection from crime." *Saffold v. State*, 938 N.E.2d 837, 840 (Ind. Ct. App. 2010) (citations omitted), *trans. denied*. To determine

reasonableness, we consider: (1) the degree of concern, suspicion, or knowledge that a violation has occurred, (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and (3) the extent of law enforcement's needs. *Litchfield*, 824 N.E.2d at 361.

As an initial matter, the State claims Parish waived any argument under the Indiana Constitution when he failed to make that argument on direct appeal. The State also argues that, notwithstanding waiver, Parish has not demonstrated that his appellate counsel was deficient in foregoing an argument under Article 1, Section 11 because such argument "is not clearly and undeniably stronger than his claim under the Fourth Amendment." (Br. of Appellee at 45.) We recognize, however, that Parish may still prevail in proving ineffective assistance of counsel should it be demonstrated that, but for counsel's oversight, the unraised issue would have been successful and the result of the proceeding would have been different but for counsel's errors. *See Taylor*, 840 N.E.2d at 331 (prejudice proven if the result of a proceeding would have been different but for counsel's errors).

## 1. Degree of Concern, Suspicion, or Knowledge

Regarding the first *Litchfield* factor, the officer's degree of concern, suspicion, or knowledge, the post-conviction court found:

> Officer Foster's aim, after lawfully stopping Petitioner for infractions, was to find any guns Petitioner might possess. The degree of concern, suspicion, or knowledge that Petitioner would have one or more guns was high, arising from reports of his

> participation in several shootings and his reported threat to shoot
> the next officer he encountered. *Parish*, 936 N.E.2d at 348.

(PCR App. Vol. II at 24.)

[31] The constitutionality of Officer Foster's actions is supported by case law. In *Mitchell,* our Indiana Supreme Court found "nothing unreasonable in permitting an officer, who may have knowledge or suspicion of unrelated criminal activity by the motorist, to nevertheless respond to an observed traffic violation," even if the officer was motivated by "furthering an unrelated criminal investigation." 745 N.E.2d at 787. The court further explained that any unreasonable subsequent search and seizure associated with the traffic stop "is most likely to arise not in the routine police handling of the observed traffic violation, but in the ensuing police investigatory conduct that may be excessive and unrelated to the traffic law violation." *Id*. A reasonable search under Article 1, Section 11 allows an officer "to briefly detain a motorist only as necessary to complete the officer's work related to the illegality for which the motorist was stopped." *Id*. at 788. Despite the defendant's contention in *Mitchell* that his lengthy detainment was unreasonable under Article 1, Section 11, the court held that the detention "was not related to Mitchell's stop sign violation but to the ensuing discovery of the weapon and probable drugs in the possession of Mitchell's passenger, combined with [Officer] Boomershine's knowledge regarding the current and past narcotics investigations involving Mitchell and Miller." *Id*.

[32] In the present case during the direct appeal proceedings, the appellate court noted, and Parish's counsel emphasized, that when Officer Foster first approached Parish's car and told him to step out of the vehicle, Parish did not immediately comply, but instead inquired why Officer Foster did not first ask for his driver's license and registration. *Parish*, 936 N.E.2d at 350. Officer Foster explained to Parish that she knew who he was and asked him to step out of the car, rather than allow him to access his glove box and whatever potentially dangerous items may have been in there. *Id*. Officer Foster likely harbored a reasonably high suspicion that Parish was in possession of weapons in connection to dangerous activity. Officer Foster's degree of suspicion based on her knowledge of Parish's prior dangerous activities and thus her continued investigation of his vehicle weighs in the State's favor under the first *Litchfield* factor.

## 2. Degree of Intrusion

[33] The second *Litchfield* factor, degree of intrusion, is evaluated from Parish's point of view and measured as the degree of intrusion into his ordinary activities. *See Litchfield,* 824 N.E.2d at 360. The post-conviction court found that "the degree of intrusion during the search of the glove box into [Parish's] ordinary activities, given that he was already lawfully stopped for infractions, was low to moderate at most." (PCR App. Vol II at 201.) The State argues the degree of additional interruption resulting from the officer looking in Parish's glove box was minimal.

In *Washburn v. State,* 121 N.E.3d 657, 663 (Ind. Ct. App. 2019), *trans. denied*, our court held that the degree of intrusion by a warrantless forced entry into a locked box found in Washburn's car was low, because:

> Washburn was already the subject of a narcotics investigation, he was in a car and not a home, a K-9 officer arrived at the scene less than six minutes after Washburn was stopped, and the K-9 alerted to drugs in the safe only after Washburn had already been arrested on an outstanding Kentucky warrant.

*Id*. at 663-664.

The facts here are similar to those in *Washburn*. Officer Foster searched Parish's car based on suspicion that Parish was possibly armed and willing to cause harm. Because his person and his car were already being searched, and given that it took Officer Foster only a few seconds to take Parish's keys from the ignition to unlock the glove box, Officer Foster did not disturb to any great extent the method in which Parish conducted his "ordinary activities." We agree with the post-conviction court's assessment that the degree of intrusion by Officer Foster was low.

### 3. Extent of Law Enforcement Needs

As for the third factor, the extent of law enforcement needs, the post-conviction court found:

> The extent of law enforcement needs, in view of the important need for officer safety, was high. Under the Indiana Constitution, some intrusions upon privacy are tolerated, so long as they are reasonably aimed toward concerns about safety,

security, and protection from crime. As Petitioner was only stopped for infractions and was not under arrest, it was to be expected that he would be released to go on his way at the conclusion of the stop. At that point, if he had a gun, he would be free to retrieve it from the glove box and use it to shoot the officers he had just encountered, if he saw fit to carry out his reported threat.

(PCR App. Vol. II at 201-2) (citations omitted).

[37] While Parish was seemingly cooperative during his brief detainment, after releasing him back to his vehicle, Officer Foster could have reasonably suspected that any weapon left in Parish's car could be used against her or the next officer he encountered. Our Indiana Supreme Court has explained that reasonable suspicion exists "if the facts known to the officer, together with the reasonable inferences arising therefrom, would cause an ordinarily prudent person to believe that criminal activity has or is about to occur." *Baldwin v. Reagan*, 715 N.E.2d 332, 340 (Ind. 1999). Here, Officer Foster had knowledge of Parish's prior criminal activity and threat to shoot an officer. Thus, the extent of law enforcement need was high. *See D.F. v. State*, 34 N.E.3d 686, 690 (Ind. Ct. App. 2015) (extent of law enforcement needs high when teenager reported to have handgun in a public park), *trans. denied*.

[38] Under the totality of circumstances, Officer Foster's search of Parish's locked glove box did not violate his rights against unlawful search and seizure under Article 1, Section 11 of the Indiana Constitution. *See State v. Crager*, 113 N.E.3d 657, 665 (Ind. Ct. App. 2018) (officer's degree of suspicion was high based on

active arrest warrant, level of intrusion was "not high" because locked compartment in Crager's backpack was easily accessible and opened with a key, and extent of law enforcement needs were high because officer was concerned about his safety; thus, based on the totality of the circumstances, the search was lawful), *trans. denied*. Therefore, Bohdan did not render ineffective assistance of counsel by neglecting to raise that argument, because it would not have changed the outcome of Parish's direct appeal. *See Bieghler*, 690 N.E.2d at 200 (appellate counsel not ineffective for failing to advance an argument on direct appeal that would not have changed the outcome of the direct appeal).

# Conclusion

[39] Parish has failed to demonstrate that Bohdan's alleged ineffectiveness of counsel during trial resulted in irreparable prejudice, given the existence of other undisputed incriminating evidence. As for alleged ineffectiveness of counsel on appeal, the totality of the circumstances, as evaluated under the three *Litchfield* factors, demonstrate that the search of Parish's locked glovebox was necessary and permissible under Article 1, Section 11 of the Indiana Constitution. Parish's counsel therefore did not provide ineffective assistance in failing to raise that claim under the broader protection from unwarranted searches afforded by our Indiana Constitution. Accordingly, we affirm the court's denial of Parish's post-conviction petition.

[40] Affirmed.

Robb, J., and Vaidik, J., concur.